**LOWENSTEIN SANDLER PC**
Norman N. Kinel, Esq.
John K. Sherwood, Esq. (*admitted pro hac vice*)
David A. Van Grouw, Esq. (*admitted pro hac vice*)
Terence D. Watson, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402

*Attorneys for Paymentech, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VELO HOLDINGS INC., *et al.*, | Case No. 12-11384 (MG) |
| Debtors.[1] | Jointly Administered |
| VELO HOLDINGS INC., *et al.*, | Adversary No. 12-01564(MG) |
| Plaintiffs, | |
| v. | |
| PAYMENTECH, LLC | |
| Defendant. | |

**PRE-TRIAL MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

[1] The Debtors in these cases along with the last four digits of their federal tax identification number are: Velo Holdings Inc. (3155), V2V Holdings LLC (8801), Coverdell & Company, Inc. (4660), V2V Corp. (0857), LN, Inc. (8759), FYI Direct Inc. (2491), Vertrue LLC (6882), Idaptive Marketing LLC (3362), My Choice Medical Holdings, Inc. (5870), Adaptive Marketing LLC (6882), Interactive Media Group (USA) Ltd. (1016), Brand Magnet, Inc. (8978), Neverblue Communications, Inc. (7832), and Interactive Media Consolidated Inc. (0774).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ........................................................................................................3

ARGUMENT ..............................................................................................................5

    THE DEBTORS ARE NOT ENTITLED TO THE ENTRY OF A
    PRELIMINARY INJUNCTION ...............................................................................5

        I.      Standards Applicable To Requests For Injunctive Relief............................5

        II.     The Debtors Are Not Likely To Succeed On The Merits Of Their
              Claims ........................................................................................................7

              A.     The Automatic Stay Is Not Applicable Because The
                     Processing Agreements Were Properly Terminated
                     Pursuant To The Prepetition Termination Notice............................7

              B.     Section 365(e)(1) Of The Bankruptcy Code Does Not
                     Apply To A Prepetition Termination Of A Contract......................12

              C.     Even If Section 365(e)(1) Of The Bankruptcy Code Were
                     Applicable To A Prepetition Termination, The Processing
                     Agreements Were Not Terminated Solely On The Basis Of
                     The Debtors' Financial Condition .................................................16

        III.    The Debtors Have Not Demonstrated Irreparable Harm Warranting
               Injunctive Relief......................................................................................16

        IV.    The Balance Of Hardships Tips In Favor Of Paymentech ........................19

        V.     The Remaining Requirements For Injunctive Relief Have Not
               Been Met...................................................................................................23

CONCLUSION.........................................................................................................24

# TABLE OF AUTHORITIES

**Pages**

CASES

*151 West Associates v. Printsiples Fabric Corp.*,
    459 N.Y.S. 2d 605 (N.Y. App. Div. 1983) ("*Printsiples*")..........................................12, 13, 14

*Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*,
    1998 WL 67663, *5 (S.D.N.Y. Feb.18, 1998)......................................................................17

*In re Anne Cara Oil Co.*,
    32 B.R. 643 (Bankr. D. Mass. 1983) .....................................................................................8

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    934 F.2d 30 (2d Cir. 1991).....................................................................................................17

*In re C.A.F. Bindery, Inc.*,
    199 B.R. 828 (Bankr. S.D.N.Y. 1996) ...................................................................................16

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273, 276 (2d Cir.1985)............................................................................................18

*In re Commodity Merchants Inc.*,
    538 F.2d 1260 (7th Cir.1976) ................................................................................................15

*COMP III, Inc. v. Computerland Corp. (In re COMP III, Inc.)*,
    136 B.R. 636 (Bankr. S.D.N.Y. 1992) ...................................................................................14

*Consol. Brands, Inc. v. Mondi*,
    638 F.Supp. 152, 155 (E.D.N.Y.1986) ...................................................................................17

*Dominic v. Delaloye*,
    2012 WL 1339604 (E.D.N.Y. April 17, 2012) ....................................................................5, 6

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)........................................................5

*In re First Republic Group Realty, LLC*,
    421 B.R. 659 (Bankr. S.D.N.Y. 2009)........................................................................... passim

*Fxdirectdealer, LLC v. Abadi*,
    2012 WL 1155139 (S.D.N.Y., April 5, 2012) .........................................................................5

*In re Gordon Car & Truck Rental, Inc.*,
    59 B.R. 956 (Bankr. N.D.N.Y. 1985) ("*Gordon Car*") ..........................................................13

*Grand River Enterp. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60, 66 (2d Cir.2007)................................................................................................16

*Hanson Trust PLC v. SCM Corp.*,
    774 F.2d 47 (2d Cir. 1985)......................................................................................................5

*Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc.*,
    2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) ........................................................................6

## TABLE OF AUTHORITIES (cont'd)

Pages

*LJP Inc. v. Royal Crown Cola Co. (In re LJP Inc.)*,
22 B.R. 556 (Bankr. S.D. Fla. 1982)..................................................................15

*In re Lyondell Chemical Co.*,
402 B.R. 571 (Bankr. S.D.N.Y. 2009)................................................................19

*In re M.J. & K Co., Inc.*,
161 B.R. 586 (Bankr. S.D.N.Y. 1993)..................................................................8

*In re Margulis*,
323 B.R. 130 (Bankr. S.D.N.Y. 2005)...............................................................8, 9

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)............................................................................................5

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984)..................8, 9, 10

*Nemko, Inc. v. Motorola (In re Nemko, Inc.)*,
163 B.R. 927 (Bankr. E.D.N.Y. 1994)...............................................................15

*Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*,
365 B.R. 401 (S.D.N.Y. 2007)..............................................................................6

*Rex Medical L.P. v. Angiotech Pharmeceuticals (US). Inc.*,
754 F.Supp.2d 616 (S.D.N.Y.2010)......................................................................5

*Salinger v. Colting*,
607 F.3d 68, 74–75 (2d Cir.2010)........................................................................5

*In re Seven Stars Restaurant Inc.*,
122 B.R. 213 (Bankr.S.D.N.Y.1990)..................................................................15

*In re St. Casimir Development Corp.*,
358 B.R. 24 (S.D.N.Y. 2007)...........................................................................9, 10

*Summit Inv. & Dev. Corp. v. Leroux*,
69 F.3d 608 (1st Cir. 1995)................................................................................16

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007)................................................................................5

*In re Third Eighty–Ninth Assocs*,
138 B.R. 144, 146 (S.D.N.Y. 1992).......................................................................6

*Tough Traveler, Ltd. v. Outbound Products*,
60 F.3d 964, 968 (2d Cir.1995)..........................................................................18

*Tucker Anthony Realty Corp. v. Schlesinger*,
888 F.2d 969, 975 (2d Cir.1989)........................................................................17

## TABLE OF AUTHORITIES (cont'd)

**Pages**

*In re United Health Care Org.*,
  210 B.R. 228, 233 (S.D.N.Y. 1997)...........................................................................6

*VNO 100 West 33rd Street LLC v. Square One of Manhattan, Inc.*,
  874 N.Y.S. 2d 683 (Civil Ct., New York County 2008) ........................................11

*White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*,
  5 B.R. 112 (Bankr. M.D. Tenn. 1980) ...................................................................8

*In re Wills Motors, Inc.*,
  133 B.R. 297 (Bankr.S.D.N.Y.1991)....................................................................15

*Yates Dev., Inc. v. Old Kings Interchange, Inc.*
  *(In re Yates Dev., Inc.)*, 256 F.3d 1285 (11th Cir. 2001).......................................16


STATUTES

11 U.S.C. 365(e)(1).................................................................................................14

11 U.S.C. §§ 105(a), 362(a), 365(e), 541(c) ............................................................1


RULES

Fed. R. Bankr. P. 7065.........................................................................................1, 4

Pursuant to the Scheduling Order entered by the Court on June 12, 2012 [Docket No. 38], Paymentech, LLC ("Paymentech"), the Defendant in the above-captioned adversary proceeding ("Adversary Proceeding"), by and through its undersigned counsel, respectfully submits this pre-trial memorandum of law in opposition to the above-captioned debtors' (the "Debtors" or "Plaintiffs") *Motion, Pursuant to 11 U.S.C. §§ 105(a), 362(a), 365(e), 541(c), And Fed. R. Bankr. P. 7065, For A Preliminary Injunction* (the "Motion") [Docket Nos. 2-6].

## PRELIMINARY STATEMENT[2]

It is undisputed that Paymentech provided the Debtors with the Termination Notice months prior to the Petition Date, as it was entitled to do under the terms of the Processing Agreements, after having put the Debtors on notice more than nine months earlier that termination was a distinct possibility unless the Debtors reformed their business practices. Thus, there is only one legal issue the Court needs to decide in order to rule on the Motion: whether the Termination Notice terminated the Processing Agreements effective as of April 27, 2012, or not. If the Court rules that the Termination Notice effectively terminated the Processing Agreements, then the Debtors have absolutely no likelihood of success on the merits of their Complaint and the Motion must be denied.

As demonstrated below, the Debtors have not shown that they are at all likely to succeed on the merits of their claim that the Processing Agreements have not been terminated and remain executory and subject to assumption. Because the Termination Notice was provided long before the Petition Date and Termination became effective upon the mere passage of time, neither the automatic stay nor the prohibition on *ipso facto* terminations under section 365(e)(1) of the Bankruptcy Code are implicated, regardless of the reason or combination of reasons why the

---

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them

Termination Notice was given.  Moreover, the Debtors conceded in the *Declaration of Lorraine DiSanto* filed in support of the Motion on April 12, 2012 [Docket No. 4] that no further actions are necessary to effect termination and allege only that certain *post-termination* actions will be taken as contemplated under the Processing Agreements.

To the extent the Court deems it necessary to determine whether any of the other requirements for the granting of a preliminary injunction have been met, Paymentech respectfully submits that the Debtors have not met their burden of proof with respect to those requirements.

First, the Debtors' claim that they will be irreparably harmed absent a Court order compelling Paymentech to continue performing services under the Processing Agreements, notwithstanding the Termination, is belied by the fact that the Debtors had notice of the Termination since January 2012 (and were aware of the likelihood of termination for at least the better part of a year before then) and to date – *six months later* – they still have not obtained replacement credit card processing services from any alternative credit card processor. *Irreparable harm cannot be self-inflicted.*

Second, the balance of hardships tips decidedly in Paymentech's favor because the Debtors have only themselves to blame for their loss of credit card processing services from Paymentech and their failure to find an alternative credit card processer, while Paymentech is likely to suffer significant consequences in the event it is compelled to continue performance under the Processing Agreements.

Third, the Debtors have not addressed, let alone demonstrated, (i) that remedies at law, such as monetary damages, are inadequate to compensate for any alleged injury to the Debtors, or (ii) that the public interest would not be disserved by the issuance of a preliminary injunction.

---

below.

Based on the foregoing and for the reasons set forth below, the Motion should be denied and the TRO vacated.

## BACKGROUND

1.    On April 2, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under Chapter 11 of the Bankruptcy Code.

2.    Prior to the Petition Date, the Debtors and Paymentech were parties to three credit card processing agreements (collectively, the "Processing Agreements").[3]   Pursuant to the Processing Agreements, Paymentech processes credit card and related online financial transactions for what the Debtors describe as their Credit & Identity Theft Protection Business and Lifestyle & Shopping Business (collectively, the "ACU Business," also known as "Vertrue").  *Declaration of Heidi Biesterveld* (the "Biesterveld Decl."), filed contemporaneously herewith, at ¶¶ 13-14.

3.    As a result of certain pre-petition events of default having occurred under the Processing Agreements, and in accordance with the provisions of the Processing Agreements, on or about January 20, 2012, Paymentech provided written notice (the "Termination Notice") to the Debtors terminating the Processing Agreements (the "Termination"), originally effective April 20, 2012, and subsequently extended to April 27, 2012.  Biesterveld Decl. at ¶ 29.

4.    On April 20, 2012, the Debtors commenced this Adversary Proceeding with the filing of their *Complaint For Permanent Injunction And Declaratory Relief* ("Complaint") [Docket No. 1].

---

[3]  The three Processing Agreements (as amended) are the following: (i) that certain Credit Card Processing Services Agreement between Adaptive Marketing, LLC (purported successor in interest to Memberworks, Inc.) ("Adaptive") and Paymentech (successor in interest to First USA Merchant Services, Inc.), dated December 30, 1997 (the "U.S. Agreement"), (ii) that certain Canadian/VISA Merchant Agreement between Adaptive and Paymentech (successor in interest to Paymentech Merchant Services, Inc.), dated February 23, 1999 (the "Canadian/VISA Agreement"), and (iii) that certain Canadian/MasterCard Merchant Agreement, between Adaptive and Paymentech (successor in

5.      On April 20, 2012, the Debtors also filed the Motion, seeking entry of a temporary restraining order and preliminary injunction: (a) "enjoining Paymentech from terminating the Processing Agreements, or otherwise failing to honor its obligations under the agreements to process Vertrue members' credit card transactions unless and until Vertrue assumes or rejects the Processing Agreements in accordance with section 365 of the Bankruptcy Code," (b) "scheduling briefing and a hearing on the request for preliminary injunctive relief," and (c) extending the termination date of the Processing Agreements 30 days, through and including May 28, 2012, pending a hearing on the Debtors' request for a preliminary injunction.

6.      On April 25, 2012, the Court held a hearing on and granted the Debtors' request for a temporary restraining order.

7.      On April 26, 2012, the Court entered the *Order to Show Cause for Temporary Restraining Order and Preliminary Injunction* (the "TRO") [Docket No. 12].   The TRO temporarily enjoined and restrained Paymentech from "terminating the Processing Agreements" and ordered Paymentech to show cause at a hearing on May 7, 2012 (the "PI Hearing") why an Order should not be entered pursuant to Fed. R. Bankr. P. 7065 preliminarily enjoining Paymentech "from terminating the Processing Agreements."   The TRO was subsequently extended pursuant to this Court's *Order Compelling Production of Electronically Stored Information and Consequences for Failure to Comply* [Docket No. 14] and the PI Hearing is presently scheduled to commence on June 26, 2012.

---

interest to Paymentech Merchant Services, Inc.), dated February 23, 1999 (the "Canadian/MasterCard Agreement", and together with the Canadian/VISA Agreement, the "Canadian Agreements").

## **ARGUMENT**

### **THE DEBTORS ARE NOT ENTITLED TO THE ENTRY OF A PRELIMINARY INJUNCTION**

**I.**    **Standards Applicable To Requests For Injunctive Relief**

8.    "The Second Circuit recognizes a preliminary injunction as 'one of the most drastic tools in the arsenal of judicial remedies' that should be granted only in extraordinary circumstances." *In re First Republic Group Realty, LLC*, 421 B.R. 659, 677 (Bankr. S.D.N.Y. 2009) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985). *See also Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) ("'a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion'") (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, (1997)) (emphasis in the original).

9.    Consequently, "a preliminary injunction should issue upon a showing of a plaintiff's likelihood of success on the merits only where the plaintiff has also shown that: (1) he is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships tips in his favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction." *Fxdirectdealer, LLC v. Abadi*, 2012 WL 1155139, *3 (S.D.N.Y., April 5, 2012) citing *Rex Medical L.P. v. Angiotech Pharmeceuticals (US). Inc.,* 754 F.Supp.2d 616 (S.D.N.Y. 2010), *Salinger v. Colting,* 607 F.3d 68, 74–75 (2d Cir. 2010) and *eBay, Inc. v. MercExchange, L.L.C,* 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

10.    Although courts have held that a preliminary injunction may also issue upon showing "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor," *Dominic v. Delaloye*,

2012 WL 1339604, *10 (E.D.N.Y. April 17, 2012) (citations omitted), this standard does not lighten the Debtors' burden.  Specifically, "[b]ecause the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Id.* (emphasis in original).

11.     Under a second line of cases in the bankruptcy context, courts within the Second Circuit have looked to the following factors to assess whether a preliminary injunction pursuant to section 105 of the Bankruptcy Code should be granted:  (1) whether there is a danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize; (2) whether the debtor has demonstrated a reasonable likelihood of a successful reorganization; (3) balancing the relative harm as between the debtor and the defendant; and (4) the public interest which requires a balancing of the public interest in successful reorganizations with competing societal interests. *See Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007); *In re United Health Care Org.*, 210 B.R. 228, 233 (S.D.N.Y. 1997).  In evaluating these factors, courts take a "flexible approach and no one factor is determinative." *In re Calpine Corp.* at 409 (quoting *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc.*, 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006)).[4]

12.     Regardless of the test applied, however, the party seeking an injunction must establish that it is entitled to such relief by a preponderance of the evidence. *In re Third Eighty–Ninth Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992) ("[t]he debtor bears the burden of proof in

---

[4]  Consideration of these factors does not alter the conclusion that the Debtors are not entitled to the injunctive relief they seek.  First, for the reasons set forth below, (i) the Debtors have not, and cannot show irreparable harm that was not self-inflicted, and (ii) the balancing of the relative harm as between the Debtors and Paymentech tips decidedly in favor of Paymentech.  Moreover, the Debtors, who bear the burden in connection with the Motion, have not even attempted to demonstrate (i) a reasonable likelihood of a successful reorganization, or (ii) that the public interest in successful reorganizations outweighs competing societal interests.  Indeed, the Debtors are not reorganizing, but rather are effectively liquidating the ACU Business.

obtaining the extraordinary and drastic remedy of an injunction") (citation and quotation marks omitted).

## II. The Debtors Are Not Likely To Succeed On The Merits Of Their Claims

13.     The Complaint seeks a declaratory judgment that (i) the Processing Agreements are executory contracts, (ii) the termination of the Processing Agreements violates the automatic stay under section 362 of the Bankruptcy Code, and (iii) the termination of the Processing Agreements is unenforceable under section 365(e)(1) of the Bankruptcy Code.

14.     The Debtors have not, and cannot, demonstrate that they are likely to prevail on the merits of these claims, or even that there is are sufficiently serious questions going to the merits of these claims to make them a fair ground for litigation.  Because the Termination Notice was provided prepetition and but for the TRO, would have taken effect with the mere passage of time on April 27, 2012, neither the automatic stay of section 362 of the Bankruptcy Code, nor the prohibition against enforcement of ipso facto clauses in section 365(e)(1) of the Bankruptcy Code prevent termination of the Processing Agreements or are even implicated in the case *sub judice*.

### A.     The Automatic Stay Is Not Applicable Because The Processing Agreements Were Properly Terminated Pursuant To The Prepetition Termination Notice

15.     With respect to the first declaration sought by the Debtors, the automatic stay does not apply because the Processing Agreements were terminated prior to the Petition Date through the Termination Notice, which fixed April 20, 2012 (subsequently extended to April 27, 2012) as the last day for the performance of processing services.  Significantly, the Debtors do not, and cannot, claim that Paymentech had no right to terminate the Processing Agreements in accordance with their terms.  In this regard, it is well settled that the mere filing of a bankruptcy

petition does not enhance a debtor's contract rights or diminish its obligations. *See, e.g., In re M.J. & K Co., Inc.*, 161 B.R. 586, 593 (Bankr. S.D.N.Y. 1993).

16.     Once the Termination Notice was given, the termination of the Processing Agreements was simply a function of the passage of time and but for the TRO, would have taken effect automatically on April 27, 2012 without any further action by Paymentech.   Thus, following issuance of the Termination Notice on January 20, 2012, the Processing Agreements automatically terminated on April 27, 2012 without any action by Paymentech that could violate or otherwise implicate the automatic stay.  Indeed, the further actions claimed by the Debtors to be "material obligations" to be performed following termination of the Processing Agreements (which, in any event, Paymentech does not concede need to occur) will all be performed "post-termination."  *See Declaration of Lorraine DiSanto* in support of the Motion, filed on April 12, 2012 [Docket No. 4] (the "DiSanto Decl."), at ¶13.

17.     Under these circumstances, it is black letter law that the automatic stay of section 362 of the Bankruptcy Code is simply not implicated.  *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) ("[t]he automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract"); *In re Margulis*, 323 B.R. 130, 133 (Bankr. S.D.N.Y. 2005) ("the automatic stay does not toll or restrain the mere passage of time.  Thus, it does not stop a contract from terminating by its own terms as long as the termination does not depend on a post-petition 'act.'"); *In re Anne Cara Oil Co.*, 32 B.R. 643 (Bankr. D. Mass. 1983) (holding that prepetition notice of termination validly terminated contract one day after the petition date because the automatic stay does not toll the mere running of time); *White Motor Corp. v. Nashville White Trucks, Inc. (In re Nashville White Trucks, Inc.)*, 5 B.R. 112 (Bankr. M.D. Tenn. 1980) (post-

petition termination of franchise agreement by its own terms was not subject to the automatic stay; upon expiration of franchise agreement, franchise was no longer property of the estate).

18.    Moreover, it is beyond question that a contract that expires by its own terms after the petition date, or which was validly terminated prior to the petition date, cannot be resurrected and/or assumed by a debtor.  *See Moody*, 734 F.2d at 1214 ("[w]here a contract has been validly terminated pre-bankruptcy, the debtors' rights to continued performance under the contract have expired.  The filing of a petition under chapter 11 cannot resuscitate those rights"); *Moody,* at 734 F.2d at 1213 ("[w]hen the termination notice was sent, debtors only had a right to ninety days' worth of dealership contracts.  The filing of the petition does not expand that right")[5]; *In re Margulis,* 323 B.R. at 135 ("[w]hen termination occurs without any action by the non-debtor party, the contract is no longer executory and no longer subject to assumption or rejection").

19.    To the extent the Debtors continue to rely on *In re St. Casimir Development Corp.*, 358 B.R. 24 (S.D.N.Y. 2007), that reliance is misplaced, because the partnership agreement at issue there required the non-debtor counterparty to undertake a three-step removal procedure in order to remove the debtor as general partner:  (1) a fifteen day notice of default, (2) a ten day notice of intent to remove, and (3) a final notice of removal.  Although two of these steps occurred prior to the debtor's chapter 11 bankruptcy petition, the third did not and "[b]ecause the final removal letter constituted 'an affirmative act of the non-debtor party,' which was prohibited by the automatic stay," the court determined that the partnership agreement remained executory.  358 B.R. at 45.

20.    The district court in *St. Casimir* distinguished the facts in that case from several other cases where courts have held that where a party had "taken the last necessary step to end its

relationship with the debtor prior to the debtor's filing in bankruptcy," even if the termination was not effective until post-petition, such contracts were effectively deemed terminated pre-petition and not subject to assumption/rejection under section 365. *Id.* at 42-43.

21.     For example, in *Moody v. Amoco Oil Co.,* 734 F.2d at 1212–13, the debtor entered into a contract with Amoco Oil Company, under which Amoco served as the supplier and franchisor for the debtor's retail petroleum dealerships. After the debtor's bank notified Amoco that checks given to Amoco by the debtor as payment under the contract would not be honored, Amoco sent the debtor a letter demanding that, pursuant to the contract, the debtor cure the dishonored checks within five days. *Moody*, 734 F.2d at 1205–06. When the debtor failed to cure this default, Amoco mailed a termination notice, noting that the default had not been cured in the requisite period and announcing that – pursuant to federal statute – "cancellation is to become effective ninety days from the date of this letter." *Id*. One day after receiving the termination notice, the debtor filed for chapter 11 bankruptcy. *Id*.

22.     The Seventh Circuit held that the contract was effectively terminated pre-petition and was therefore not subject to assumption under section 365 because Amoco had taken the last act necessary to effect termination of the contract prior to the bankruptcy filing:

> If a contract has been terminated pre-bankruptcy, there is nothing left for the debtor to assume. However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law … *[H]ere the dealership termination notices were effective prior to debtors' filing in bankruptcy. The contract gave debtors no right to cure once the termination notices were mailed. Amoco did not have to take any further action to terminate the contracts; termination was automatic at the end of ninety days ...* The fact that the termination itself was not effective for ninety days does not affect the result. The filing of the chapter 11 petition cannot expand debtors' rights as against Amoco.

---

[5]  It should be noted that even if the Processing Agreements were executory – which they are not – and the Debtors had successfully moved to assume them prior to the Termination, the assumption would have only been effective through the remaining term under the agreements, *i.e.*, April 27, 2012.

*Id*. at 1212–13 (emphasis added; citations omitted).  Here, as in Moody, Paymentech took all steps necessary to terminate the Processing Agreements prepetition pursuant to an unambiguous notice of termination.

23.     It bears noting that under paragraphs 9, 26 and 29 of the U.S. Agreement Paymentech had the right to terminate that agreement without providing *any* notice at all. However, because of the potential impact on Vertrue's business in the event the Processing Agreements were immediately terminated without notice, Paymentech took the commercially reasonable step of terminating the Processing Agreements effective as of April 20, 2012 (subsequently extended to April 27, 2012).

24.     In any event, the fact that Paymentech terminated the Processing Agreements effective as of April 20, 2012, rather than immediately without notice, does not alter the fact that there was a present intent to terminate and nothing more needed to be done.  In other words, the notice of termination provided on or about January 20, 2012 was just that; *a notice of termination*, rather than, as claimed by the Debtors, merely an indication of a plan to terminate the agreements at some date in the future.  *See VNO 100 West 33rd Street LLC v. Square One of Manhattan, Inc.,* 874 N.Y.S. 2d 683, 687 (Civil Ct., New York County 2008) (landlord's notice of termination of lease after 120 day notice period effectuated termination under New York law and no further action was required).

25.     Based on the foregoing, it is clear that the termination of the Processing Agreements pursuant to the prepetition Termination Notice did not violate the automatic stay because the Termination Notice was provided prior to the Petition Date and the Termination took effect automatically on that date.  Indeed, the Debtors, who carry the burden of proof, have not submitted any evidence that any further actions by Paymentech are required for Termination of

the Processing Agreements.  To the contrary, the only "evidence" submitted by the Debtors

confirms that any further alleged actions will occur "post-termination."  (DiSanto Decl., at ¶ 13).

Consequently, the Debtors cannot show that they are likely to succeed on the merits of their

claim seeking a declaration that the termination of the Processing Agreements violates the

automatic stay.

      **B.**      **Section 365(e)(1) Of The Bankruptcy Code Does Not Apply To A
Prepetition Termination Of A Contract**

      26.      The Debtors' reliance on section 365(e)(1) of the Bankruptcy Code in an effort to

avoid termination of the Processing Agreements as based on an *ipso facto* clause is equally

without merit.

      27.      Section 365(e)(1) provides, in pertinent part, as follows:

> Notwithstanding a provision in an executory contract or unexpired
> lease, ... an executory contract or unexpired lease of the debtor
> may not be terminated or modified, and any right or obligation
> under such contract or lease may not be terminated or modified, at
> any time **after** the commencement of the case solely because of a
> provision in such contract or lease that is conditioned on —
>
> (A) the insolvency or financial condition of the debtor at any time
> before the closing of the case;
>
> (B) the commencement of a case under this title; or
>
> (C) the appointment of or taking possession by a trustee in a case
> under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1) (emphasis added).  On its face, section 365(e)(1) applies only to

*postpetition* terminations or modifications of a contract or lease; that is, terminations or

modifications that occur "*after*" commencement of the case.

      28.      Thus, it is not surprising that in their brief in support of the TRO, the Debtors

cited to only *two* decisions that allegedly support their argument that section 365(e)(1)

invalidates a *pre-petition* termination of a contract based on an *ipso facto* clause:  *151 West*

*Associates v. Printsiples Fabric Corp.*, 459 N.Y.S. 2d 605 (N.Y. App. Div. 1983) ("*Printsiples*")

and *In re Gordon Car & Truck Rental, Inc.*, 59 B.R. 956 (Bankr. N.D.N.Y. 1985) ("*Gordon*

*Car*").  As set forth below, however, *Printsiples* did not even involve an actual bankruptcy filing

and its analysis of section 365(e) of the Bankruptcy Code was *dictum*.  Moreover, *Gordon Car*

indeed rejected *Printsiples* analysis as *dictum* and instead enforced a termination clause in a

license agreement which was exercised pre-petition.  Thus, with the arguable exception of

*Printsiples*, Paymentech is aware of no decision that has held that section 365(e)(1) of the

Bankruptcy Code applies to a *prepetition* termination of a contract.

29.     In *Printsiples*, the defendant tenant leased certain premises from the plaintiff

lessor and sublet the premises to a defendant subtenant.  The lease provided the lessor with the

right to terminate the lease if, during the term of the lease, a bankruptcy petition was filed by or

against the tenant, and within 60 days thereof, the tenant failed to secure a dismissal thereof, or if

the tenant made an assignment for the benefit of creditors or petitioned for or entered into an

"arrangement."  The tenant experienced financial difficulties during the lease term and the

tenant's shareholders transferred their stock to the third party.  As a result, the lessor purported to

invoke its right to terminate the lease under the "bankruptcy" provision and initiated an

ejectment action.  *Id.* at 76-78.

30.     After finding that the events at issue did not amount to an "arrangement," and

therefore, no default under the lease had occurred, the court nevertheless addressed the

defendants' argument that enforcement of the "bankruptcy" provision would violate section

365(e)(1).  Although the court acknowledged that section 365(e)(1) was technically inapplicable

-- because no bankruptcy proceeding had been initiated -- the court nevertheless, in *dicta*, opined

that Congress had intended, as a statement of public policy, that a contract or lease could not be

-13-

terminated solely because of a lease forfeiture provision such as the bankruptcy provision at issue: "[i]f such a clause is not to be given effect after the commencement of a bankruptcy proceeding," the court found, "there can be even less justification for doing so in the absence of a proceeding." *Id.* at 79-80.[6]

31.     The bankruptcy court in *Gordon Car* rejected *Printsiples* analysis of section 365(e)(1) as *dictum*, and instead enforced a termination clause in a license agreement which was exercised pre-petition.   59 B.R. at 960 ("[t]he Court has reviewed and analyzed *Printsiples.* Although it appears to void insolvency termination clauses outside of bankruptcy, such language was not necessary for disposition of that case.   Consequently, after weighing the above authorities, in the case *sub judice,* as the License Agreements indicate the parties expressly agreed to the termination clause without notice, the Court will enforce same as written").

32.     Similarly, in *COMP III, Inc. v. Computerland Corp. (In re COMP III, Inc.),* 136 B.R. 636 (Bankr. S.D.N.Y. 1992), a case *not* cited by the Debtors in their brief in support of the TRO, the court considered whether "11 U.S.C. 365(e)(1) applie[d] to prepetition termination of executory contracts."   136 B.R. at 639.   The court in that case was also invited to follow the reasoning applied in *Printsiples*, but declined to do so, and instead held that where, like here, an executory contract has been terminated in accordance with its terms prior to bankruptcy, section 365(e)(1) does not authorize a bankruptcy court to reinstate the contract:

> The plaintiffs invite me to apply the *Printsiples* reasoning to the facts of this case as a matter of public policy.   However enticing the invitation, I must decline it, as *I am of the view that where an executory contract has been terminated in accordance with its*

---

[6]   In addressing whether ejecting the subtenant would effect a forfeiture, the court noted that the record did not reveal any actual harm suffered by the landlord; the subtenant had expended a substantial sum in connection with the move to and utilization of the premises; neither the tenant nor the subtenant failed to perform any lease terms; the rent had been regularly and timely paid; and that following ejectment, the landlord would likely allow the subtenant to remain in possession of the premises at a higher rental.   The court therefore concluded that the landlord was merely seeking to use the lease-forfeiture provision as a means of canceling the lease in order to obtain a greater return on its property.   *Id.*

> *terms prior to bankruptcy, section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract.  See In re Wills Motors, Inc., 133 B.R. 297 (Bankr. S.D.N.Y. 1991); In re Seven Stars Restaurant Inc., 122 B.R. 213 (Bankr. S.D.N.Y. 1990); In re Commodity Merchants Inc., 538 F.2d 1260 (7th Cir. 1976).  Nor has Congress the ability, in the absence of bankruptcy or an effect on interstate commerce, to legislate such a matter, which is purely a state law concern.*

136 B.R. 639 (emphasis added).

33.     Other courts have likewise held that section 365(e)(1) is inapplicable to a prepetition termination of a contract.  *See, e.g., Nemko, Inc. v. Motorola (In re Nemko, Inc.)*, 163 B.R. 927, 938 (Bankr. E.D.N.Y. 1994) (section 365(e)(1) does not apply to an alleged executory contract that has been terminated prepetition); *LJP Inc. v. Royal Crown Cola Co. (In re LJP Inc.)*, 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) (finding that "[t]here is no provision in the Bankruptcy Code which prohibits the termination before bankruptcy of a contract on account of insolvency" and that "[t]he express provisions of [§ 365(e)(1)] convince [the court] that there is no legislative intent to invalidate the prepetition termination of a contract on the sole ground of insolvency," and as a result, dismissing debtor's complaint for injunctive relief seeking reinstatement of bottling agreement terminated prepetition based on debtor's insolvency).  *See also* Cathy E. Holley, *Privatization of Corrections: Is the State Out on a Limb When the Company Goes Bankrupt?*, 41 Vanderbilt L. Rev. 317, 327 (1988) ("The legislative history [of section 365(e)(1)] indicates that even though a bankruptcy clause cannot control the disposition of an executory contract, the clause is not entirely invalid.  Thus, a termination clause may be exercised prior to the debtor's filing of a petition in bankruptcy even if the termination is based "solely" on the debtor's insolvency.") (citations omitted).

34.     Accordingly, because the Termination Notice was provided prepetition, section 365(e)(1) is inapplicable in this case.  As a result, the Debtors have not, and cannot show that

they are likely to prevail on the merits of the claim seeking a declaration that the Termination is

unenforceable under section 365(e)(1), even if that section was applicable as a factual matter

herein, which it is not.

> **C.     Even If Section 365(e)(1) Of The Bankruptcy Code Were Applicable
> To A Prepetition Termination, The Processing Agreements Were Not
> Terminated Solely On The Basis Of The Debtors' Financial Condition**

35.     The application of section 365(e)(1) of the Bankruptcy Code is limited to the

three types of clauses enumerated in subsections (A), (B), and (C) of that section.  *Yates Dev.,*

*Inc. v. Old Kings Interchange, Inc. (In re Yates Dev., Inc.*), 256 F.3d 1285, 1289 (11th Cir.

2001).  Thus, if a termination or modification of a contract is triggered by a condition other than

one of those three, it will not be invalidated by section 365(e)(1).  *Id.* (citing *Summit Inv. & Dev.*

*Corp. v. Leroux,* 69 F.3d 608, 611 (1st Cir. 1995)); *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 833

(Bankr. S.D.N.Y. 1996) ("If the debtor's default arises for some reason other than those set forth

in section 365(e)(1), the prohibition against ipso facto clauses does not apply.").

36.     Here, the evidence will show that Paymentech did not terminate the Processing

Agreements solely because of the Debtors' financial condition, but had multiple other bases upon

which it terminated the Processing Agreements in accordance with their terms due to the

Debtors' other material breaches of the Processing Agreements.  *See* Biesterveld Decl. at ¶¶ 30,

32, 34 and 35; Declaration of Maryann Ryan, filed contemporaneously herewith, at ¶¶ 18 -20.

## III.     The Debtors Have Not Demonstrated Irreparable Harm Warranting Injunctive Relief

37.     "Within the Second Circuit's formula, 'irreparable harm is the single most

important prerequisite for the issuance of a preliminary injunction.'"  *In re First Republic Group*

*Realty, LLC*, 421 B.R at 678 (citing *Grand River Enterp. Six Nations, Ltd. v. Pryor,* 481 F.3d 60,

66 (2d Cir. 2007)) (internal citations and quotations omitted).  In other words, "[t]he moving

party must first demonstrate that irreparable injury is likely 'before the other requirements for the issuance of an injunction will be considered.'"  *Id.*

38.    "To establish irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'"  *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989), (quoting *Consol. Brands, Inc. v. Mondi,* 638 F.Supp. 152, 155 (E.D.N.Y. 1986)); *Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.,* 1998 WL 67663, *5 (S.D.N.Y. Feb. 18, 1998) ("the movant must show that irreparable harm is likely, not merely possible").  In addition, "[a]n irreparable harm is one that cannot be remedied through a monetary award."  *In re First Republic Group Realty, LLC*, 421 B.R. at 678 (citation omitted). "Accordingly, when a party has alternate, monetary remedies for the harm suffered, such harm is not irreparable."  *Id.* (citing *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991) ("when a party can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary remedy of a preliminary injunction should be granted")).

39.    The Debtors claim they will suffer irreparable harm absent injunctive relief because Paymentech processes the majority of Vertrue's credit-card transactions, which transactions account for the majority of Vertrue's revenue.  (Motion at p. 12 and DiSanto Decl. at ¶ 3).  The Debtors conveniently ignore, however, that they were on notice, as of no later than *January 20, 2012*, of the Termination of the Processing Agreements.  Nevertheless, during the past *six (6) months* the Debtors have not entered into a processing agreement with any alternative processor in order to protect themselves from the doom they predict for these cases as a result of the termination of the Processing Agreements.  Consequently, the Motion should be denied

-17-

because of the Debtors' failure, under these circumstances, to demonstrate any danger of irreparable harm that was not self-inflicted.

40.      It is clear that "[a] claim of irreparable harm is undercut by a party's unreasonable delay in seeking injunctive relief." *In re First Republic Group Realty, LLC*, 421 B.R at 679 (citing *Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 968 (2d Cir. 1995) ("any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief.  Though such delay may not warrant the denial of ultimate relief, it may, standing alone, preclude the granting of preliminary injunctive relief because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury")); *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985) ("[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action").  In other words, "[a] party's delay in seeking relief, in the face of potential harm caused by such a delay, vitiates a party's claim that such harm is irreparable." *Id.* (citations omitted).

41.      Here, upon receipt of the Termination Notice in January 2012, rather than obtain alternative credit card processing arrangements, or move for injunctive or other relief (if there were a legitimate basis for doing so) in a non-bankruptcy court of competent jurisdiction, the Debtors simply waited until April 2, 2012 to commence these bankruptcy cases, a mere eighteen (18) days prior to the Termination, and thereafter sought emergency relief against Paymentech in the hope that the Court would reward their strategic decision to risk jeopardizing their business. The Debtors' own failure to promptly act under these circumstances, during a time when

Paymentech repeatedly confirmed that it would not revoke or rescind the Termination Notice,[7] warrants denial of the Debtors' request for injunctive relief.

42.    In other words, *the Debtors have only themselves to blame for their current circumstances*, and any impact the Termination will potentially have on these cases is not irreparable harm warranting injunctive relief in the form of compelling Paymentech to continue performing under the terminated Processing Agreements. *In re First Republic Group Realty, LLC*, 421 B.R at 680 ("Amusement's claim that it will be irreparably harmed without a preliminary injunction is also undermined by Amusement's unreasonable delay in seeking injunctive relief following the allegedly improper release of the funds from escrow, despite knowledge that the funds were at risk of being depleted").

43.    The Debtors' failure to show irreparable harm should result in the denial of the Motion, without consideration of the remaining factors for the issuance of injunctive relief. *In re First Republic Group Realty, LLC*, 421 B.R at 678 ("[t]he moving party must first demonstrate that irreparable injury is likely 'before the other requirements for the issuance of an injunction will be considered'"). Consideration of the remaining factors, however, only further confirms that the Motion should be denied.

## IV.    The Balance Of Hardships Tips In Favor Of Paymentech

44.    This factor in the preliminary injunction analysis requires the Court to evaluate "whether the balance of harms tips in favor of the moving party." *In re Lyondell Chemical Co.*, 402 B.R. 571, 588 (Bankr. S.D.N.Y. 2009). Here, the balance of harms weighs strongly in favor of Paymentech.

---

[7] Biesterveld Decl. at ¶ 37.

45.    On the one hand, any purported harm to the Debtors is of their own making.  In stark contrast, however, Paymentech stands potentially to suffer great harm if it is compelled to continue to process the Debtors' VISA transactions in the face of violations of VISA regulations. As an "Acquirer," Paymentech is required by VISA to enforce and uphold VISA's Operating Regulations that govern the contractual relationship it has with merchants who accept VISA payment options for sales transactions.[8]  The Processing Agreements require that Vertrue comply with VISA's Operating Regulations, and absent such compliance, Paymentech has the right to terminate the Processing Agreements.[9]  In addition, the Operating Regulations provide that merchants cannot engage in any activity that may result in undue economic hardship or damage to the goodwill of the VISA brand.[10]

46.    Moreover, VISA set May 15, 2012 as the deadline by which Vertrue's fraud to sales rate and chargeback ratio each must have been below 50 basis points and the Debtors indisputably failed to meet those VISA requirements.  Although VISA has not yet taken any specific action against Paymentech due to the Debtors' failure, Paymentech remains in default in this regard and VISA has "reserved all of its rights and remedies" against Paymentech and "continues to consider this situation."  In addition, Paymentech believes that the reason VISA has not yet taken any action potentially adverse to the Debtors is because the Debtors have implicitly threatened VISA with potential claims for a violation of the automatic stay if it does so, including if VISA enforces the reduction of RIS ratio thresholds with respect to Vertrue that occurred on May 15, 2012, or otherwise takes any action that would adversely affect Vertrue's rights under its contracts with Paymentech.  *See* Letter from Debtors' Counsel to VISA's General Counsel, dated May 11, 2012, attached hereto as Exhibit A.

---

[8] Biesterveld Decl. at ¶ 39.
[9] Id.

47.     If VISA chooses to take action against Paymentech on the basis that Paymentech's failure to terminate the Processing Agreements constitutes a failure to enforce VISA's regulations and directives, this may result in serious consequences for Paymentech.[11] First, Paymentech may incur substantial fines and penalties that VISA could impose and they could be substantial.[12]   Second, and far more serious, VISA could terminate its contractual relationship with Paymentech, meaning that *Paymentech would no longer be permitted to process VISA transactions for any of its customers, a loss that would be devastating to Paymentech in light of the sizeable amount of Paymentech's annual revenue from VISA.*[13] Moreover, if Paymentech lost the right to process VISA cards, Paymentech's entire business could fold, as Paymentech would be in immediate breach of hundreds of thousands of merchant agreements, which, in total, would result in a devastating impact.[14]

48.     In 2011, VISA transactions processed by Paymentech accounted for approximately 60% of Paymentech's total revenue.[15]   Thus, the loss Paymentech would suffer if VISA were to terminate it as an "Acquirer" would be catastrophic and far exceed any purported harm the Debtors contend they would suffer as a result of the Termination.[16]

49.     The decision to terminate the Processing Agreements and the manner in which it was done were well within Paymentech's contractual rights under the Processing Agreements. Indeed, although pursuant to the Processing Agreements Paymentech could have terminated the Processing Agreements without providing for any time for Vertrue to find an alternate processor, instead Paymentech provided Vertrue with ninety (90) days to obtain alternate processing.  Thus,

---

[10] Id.
[11] Id. at ¶ 41.
[12] Id.
[13] Id. at ¶42.
[14] Id.
[15] Id. at ¶43.
[16] Id.

even though it was not required to do so, Paymentech gave Vertrue more than adequate and entirely commercially reasonable notice of the Termination to enable Vertrue to obtain processing services from a new processor.[17]

50.     Moreover, the fact Paymentech established a reserve (currently in the amount of $10,054,695, which approximates only one month of processing volume) pursuant to its contractual rights under the Processing Agreements to mitigate risk in the ordinary course is wholly irrelevant to the irreparable harm Paymentech will suffer if an injunction were to be issued.[18]  Indeed, there is no amount of a reserve that can or will mitigate the harm Paymentech may suffer if an injunction were to be issued.[19]

51.     Here, VISA has already spoken as to what it expects from the Debtors in terms of changes it must make to the manner in which they conduct their business.  Paymentech cannot be compelled to disregard its contractual obligations to enforce VISA regulations solely because it may have a negative effect on the Debtors' finances.  If it was, Paymentech would be exposed to substantial monetary fines and penalties and, even worse, other enforcement measures that could result in Paymentech's contractual relationship with VISA being terminated.  Paymentech's financial risk under a forced directive to continue processing beyond the contractual time period far exceeds the financial impact to the Debtors' business, particularly given that such business is in a wind down mode.

52.     Consequently, in addition to failing to show irreparable harm or a likelihood of success on the merits, the Debtors have also failed to show that the balance of hardships tips in their favor.

---

[17] Id. at ¶ 44.
[18] Id. at ¶ 45.
[19] Id.

## V.     The Remaining Requirements For Injunctive Relief Have Not Been Met

53.     The Debtors have not yet even addressed, let alone met, the remaining requirements for issuance of a preliminary injunction, namely, (i) that remedies at law, such as monetary damages, are inadequate to compensate for the plaintiff's injury, and (ii) that the public interest would not be disserved by the issuance of a preliminary injunction.

54.     First, Paymentech submits that monetary damages could compensate the Debtors for any alleged injury they may suffer if termination of the Processing Agreements were ultimately found to have been improper.  Second, public policy warrants the denial of the Motion and termination of the Processing Agreements.

55.     According to the DiSanto Decl., the Debtors intend to "harvest" the ACU Business - *i.e.*, the Debtors will continue to operate the ACU Business in the ordinary course, but will cease spending funds to acquire new members on a go-forward basis.[20]  On its face, the Debtors' plan for the ACU Business may appear innocuous.  However, Paymentech believes that the evidence will show that the Debtors *do* intend to accept new business and that they intend to bill and collect from customers for as long as they can without providing advance notice of each recurring charge to consumers.  Also, Paymentech believes that the evidence will show that a large number of consumers that are billed for services sold by Vertrue rarely (if ever) use them.  This type of operation (*i.e.*, the potential billing by Vertrue of unwary consumers) causes reputational risk and harm to both VISA and Paymentech by undermining good faith business

---

[20] The Debtors appear to have been less than candid about what they mean when they say that they "will cease spending new marketing dollars to acquire new members on a go-forward basis."  DiSanto Decl., ¶ 36.  In fact, while the Debtors may not advertise the ACU Business going forward, consumers are still able to access the websites (*e.g.*, freescore.com, identityhawk.com) and enroll in the programs offered online.  In addition, upon information and belief, the Debtors bill consumers on a recurring basis even though the credit card being charged has expired.  Biesterveld Decl. at ¶ 38, n2.

practices and consumer confidence.[21]  Thus, Paymentech submits that it would be against public

policy and societal interests to issue the injunction requested by the Debtors.

## **CONCLUSION**

56.      Based on the foregoing, Paymentech respectfully requests that the Court (i) deny

the Motion, and (ii) grant Paymentech such other and further relief as is just and proper.

Dated:  New York, New York
            June 20, 2012

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: /s/ *Norman N. Kinel*
Norman N. Kinel, Esq.
John K. Sherwood, Esq.
David A. Van Grouw, Esq.
Terence D. Watson, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York  10020
Telephone:  (212) 262-6700
Facsimile:   (212) 262-7402

*Attorneys for Paymentech, LLC*

---

[21] Id. at ¶ 38.