**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| VELO HOLDINGS INC., <u>et al.</u>, | Case No. 12-11384 (MG) |
| Debtors. | Jointly Administered |
| | |
| VELO HOLDINGS INC., <u>et al.</u>, | Adv. Pro. No. 12-01564 (MG) |
| Plaintiffs, | |
| v. | |
| PAYMENTECH, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION AFTER TRIAL GRANTING DEBTORS' PERMANENT INJUNCTION AND RELATED RELIEF AND DENYING PAYMENTECH'S MOTION TO LIFT AUTOMATIC STAY**

*A P P E A R A N C E S:*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Special Counsel to the Debtors in Possession*
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Susheel Kirpalani, Esq.
        James C. Tecce, Esq.
        Stephen A. Broome, Esq.
        Katherine Scherling, Esq.

LOWENSTEIN SANDLER PC
*Counsel for Paymentech, LLC*
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
By:    Norman N. Kinel, Esq.
        John K. Sherwood, Esq.
        David A. Van Grouw, Esq.
        Terrance D. Watson, Esq.

WILKIE FARR & GALLAGHER LLP
*Counsel for Barclays Bank PLC, as First Lien Prepetition Agent and DIP Agent*
787 Seventh Avenue
New York, New York 10019
By:    Margot B. Schonholtz, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

V2V Holdings LLC and its affiliated debtors in possession (collectively, "Vertrue" or the "Debtors") filed an adversary proceeding seeking a permanent injunction barring their credit-card processor, defendant Chase Paymentech, LLC ("Paymentech"), from terminating certain credit-card-processing agreements.  Vertrue further seeks a declaration that those agreements were not terminated prepetition and cannot be terminated now on the basis of an unenforceable *ipso facto* clause contained in the agreements.  Paymentech argues that it had terminated those agreements prior to the Debtors' bankruptcy filing based on a material adverse change in Vertrue's financial condition (specifically, a missed interest payment on December 31, 2011 on its outstanding bonds, and a consequent downgrade in its rating by Moody's).  Alternatively, in the event Paymentech did not succeed in terminating the processing agreements prepetition, it has filed a motion in the chapter 11 case seeking an order lifting the automatic stay for cause to allow it to terminate the agreements now.  In support of the lift stay motion, Paymentech argues that Vertrue committed a material non-curable default of the processing agreements by failing to comply as of May 15, 2012 with the VISA International Operating Regulations, an express requirement of the processing agreements.  For the reasons discussed below, the Court grants Vertrue's request for a permanent injunction and related declaratory relief in the adversary proceeding and denies Paymentech's motion to lift the automatic stay in the chapter 11 case.

# I.    BACKGROUND

## A.  Procedural History

On April 2, 2012, the Debtors filed their chapter 11 petitions and their motion for joint

administration was granted the next day.  (ECF Doc. # 22.)  On April 20, 2012, the Debtors

commenced an adversary proceeding against Paymentech (the "Adversary Proceeding").  (*See*

Complaint For Permanent Injunction And Declaratory Relief (the "Complaint") (Adv. Proc.,

ECF Doc. # 1).)  The Debtors also filed (i) the Motion, Pursuant to 11 U.S.C. §§ 105(a), 362(a),

365(e), 541(c), and Fed. R. Bankr. P. 7065, for Temporary Restraining Order and Preliminary

Injunction (the "PI Motion") (Adv. Proc., ECF Doc. # 2), (ii) a memorandum of law in support

of the Motion (the "TRO Memo") (Adv. Proc., ECF Doc. # 3), (iii) the declaration of Lorraine

DiSanto in support of the PI Motion (the "DiSanto Declaration") (Adv. Proc., ECF Doc. # 4),

and (iv) the declaration of Susheel Kirpalani in support of the PI Motion (the "Kirpalani

Declaration") (Adv. Proc., ECF Doc. # 5).  In response to the PI Motion, Paymentech filed the

Memorandum of Law in Support of Paymentech, LLC's Objection to Plaintiff's Motion Pursuant

to 11 U.S.C. §§ 105(a), 362(a), 365(e), and Fed. R. Bankr. P. 7065, For Temporary Restraining

Order and Preliminary Injunction (the "PI Objection") (Adv. Proc., ECF Doc. # 10), along with

the declaration of Heidi Biesterveld, dated April 24, 2012 (the "Biesterveld Declaration").  (Adv.

Proc., ECF Doc. # 9.)

On April 25, 2012, following a hearing, the Court granted the Debtors' request for a

temporary restraining order.  (*See* Order to Show Cause for Temporary Restraining Order and

Preliminary Injunction (the "TRO") (Adv. Proc., ECF Doc. # 12).)  The TRO temporarily

enjoined and restrained Paymentech from "terminating the Processing Agreements" and ordered

Paymentech to show cause at a hearing on May 7, 2012 (the "PI Hearing") why an Order should

not be entered pursuant to Bankruptcy Rule 7065 preliminarily enjoining Paymentech "from

terminating the Processing Agreements." (*Id.*)  The TRO was subsequently extended and the PI

Hearing was scheduled to commence on June 26, 2012.  (*See* Order Compelling Production of

Electronically Stored Information and Consequences for Failure to Comply (Adv. Proc., ECF

Doc. # 14).)

On May 23, 2012, Paymentech filed the Motion of Paymentech, LLC for Relief from the

Automatic Stay to Terminate Processing Agreements (the "Lift-Stay Motion").  (ECF Doc.

# 183.)  In support of the Lift-Stay Motion, Paymentech relies on the declaration of Heidi

Biesterveld, attached to the Lift Stay Motion as Exhibit D (the "Biesterveld Lift-Stay

Declaration").  The premise of the Lift-Stay Motion is that if the Court determines that

Paymentech did not successfully terminate the processing agreements prepetition, it can do so

now because of Vertrue's material non-curable breach of the processing agreements.

Because Vertrue's request for injunctive relief and Paymentech's alternative request to

lift the automatic stay involved common questions of fact, the Court combined the hearings on

both requests for relief and entered a Scheduling Order with deadlines for filing evidence and

briefs.[1]  (ECF Doc. # 38.)  This Opinion sets forth the Court's findings of fact and conclusions of

---

[1]     On June 21, 2012, the Debtors filed the Supplemental Memorandum of Law in Support of Vertrue's
Motion, Pursuant to 11 U.S.C. §§ 105(a), 362(a), 365(e), 541(c), and Fed. R. Bankr. P. 7065, for Preliminary
Injunction (the "Supplemental Memorandum").  (Adv. Proc., ECF Doc. # 46.)  The Debtors also filed a
supplemental declaration of Susheel Kirpalani (Adv. Proc., ECF Doc. # 49), another declaration of Lorraine DiSanto
(the "Supplemental DiSanto Declaration") (Adv. Proc., ECF Doc. # 50), the declaration of Jeanne Perry (the "Perry
Declaration") (Adv. Proc., ECF Doc. # 51), and the declaration of Michael J. Sage (the "Sage Declaration") (Adv.
Proc., ECF Doc. # 52).

On June 21, 2012, Paymentech filed its Pre-Trial Memorandum of Law in Opposition to Plantiffs' Motion
for a Preliminary Injunction (the "PI Opposition").  (Adv. Proc., ECF Doc. # 45.)  Paymentech also filed the
declaration of Heidi Biesterveld (the "Supplemental Biesterveld Declaration") (Adv. Proc., ECF Doc. # 47) and the
declaration of Maryann Ryan (the "Ryan Declaration") (Adv. Proc., ECF Doc. # 48).

With respect to the Lift-Stay Motion, on June 21, 2012, the Debtors and Barclays Bank, PLC (as DIP
Agent and Prepetition First Lien Agent) filed the Joint Objection of Debtors and Barclays Bank, PLC, as DIP Agent
and Prepetition First Lien Agent, to Motion of Chase Paymentech, LLC for Relief from the Automatic Stay to

law pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052.

In certain instances this Opinion also includes the Court's findings and conclusions about the

credibility of witness testimony based on the Court's opportunity to read, hear, and observe the

witness testimony.

### B. Vertrue's Credit-Card-Processing Agreements

For more than fifteen years, Paymentech has served as Vertrue's exclusive credit-card-

merchant processor.  Paymentech is one of the world's largest processors of payment-card

transactions.  In 2011, it processed more than 24 billion transactions valued at approximately

$553 billion, including nearly 50% of all internet transactions.  (Biesterveld Decl. ¶ 4.)

Paymentech is a wholly owned subsidiary of JPMorgan Chase Bank, N.A. (*Id*. ¶ 3), which is the

largest issuer of VISA and MasterCard cards in the world.

In a typical transaction, Vertrue transmits a digital sales record of the customer's card

payment to Paymentech, which relays the information to the VISA or MasterCard network.  The

VISA or MasterCard network dispatches the transaction to the customer's issuing bank, which

advances funds from the customer's line of credit, and remits the funds back to the network.  The

network makes a wire transfer to Paymentech of the dollar amount of the transaction to Vertrue,

---

Terminate Processing Agreements (the "Lift-Stay Objection").  (ECF Doc. # 265.)  The Debtors also filed the declaration of Lorraine DiSanto (the "Lift-Stay DiSanto Declaration") (ECF Doc. # 266), the declaration of Jeanne Perry (the "Lift-Stay Perry Declaration") (ECF Doc. # 267), and the declaration of Susheel Kirpalani (the "Lift-Stay Kirpalani Declaration") (ECF Doc. # 268).  On June 25, 2012, Paymentech filed Paymentech, LLC's Reply in Further Support of Motion for Relief From the Automatic Stay to Terminate Processing Agreements (ECF Doc. # 277), and the declaration of David A. Van Grouw, dated June 25, 2012 (ECF Doc. # 278).

Additionally, the parties filed designations and counter-designations from the depositions of Alan Jacobs, Gary Johnson, Jeanne Perry, George Varughese, Heidi Biesterveld, Deborah Johnson, Gerald Lannan, William Matos, and Maryann Ryan.  (*See* Parties' Joint List of Deposition Designations, Adv. Proc. (ECF Doc. # 66)).

During the trial the Court heard in-court testimony from Lorraine DiSanto, Jeanne Perry, Michael J. Sage, Heidi Biesterveld and Maryann Ryan.

As limited by the Court's rulings on motions *in limine* and objections to evidence during trial, the declarations, deposition designations and counter-designations, in-court testimony, and the exhibits admitted in evidence, form the evidentiary record for the Court's findings of fact and conclusions of law.

less a fee that Paymentech owes the issuing bank related to the transaction.  Finally, Paymentech

transfers the balance of the funds (net of any fees Vertrue owes Paymentech) to Vertrue's bank

account.  (Compl. ¶ 23.)

     As provided in the Complaint, the following is a flow-chart illustrating the relationship

between Paymentech, VISA, and Vertrue:



     Vertrue's major source of revenue consists of the charges it collects from members who

pay for Vertrue's products and services with VISA credit cards.  Vertrue collects approximately

$10 million per month from such customers, accounting for more than 55% of its total revenue

stream.  Vertrue is not qualified to submit credit-card payment receipts directly to the VISA or

MasterCard network, so Vertrue depends on Paymentech, an authorized credit-card processor, to

consummate those transactions.

     Vertrue and Paymentech are parties to three processing agreements: (i) Credit Card

Processing Services Agreement, dated December 30, 1997 (the "U.S. Agreement"), (ii)

Canadian/VISA Merchant Agreement, dated February 23, 1999 (the "Canadian/VISA

Agreement"), and (iii) Canadian/MasterCard Merchant Agreement, dated February 23, 1999 (the

"Canadian/MasterCard Agreement," and together with the Canadian/VISA Agreement, the

"Canadian Agreements"). (U.S. Agreement and Canadian Agreements, collectively hereinafter,

the "Processing Agreements.") Paymentech processes credit card and related online financial

transactions for the Debtors' "Credit & Identity Theft Protection Business" and "Lifestyle &

Shopping Business" (collectively, the "ACU Business").[2] (Biesterveld Decl. ¶ 8.)

The Processing Agreements automatically renew each year on January 25, unless

Paymentech or Vertrue provides ninety days' written notice of non-renewal.[3] (Ex. 1 § 29; Ex. 2

§ 12; Ex. 3 § 12.) Otherwise, as discussed more fully below, under the U.S. Agreement, Vertrue

and Paymentech agreed that upon the occurrence of an event of default, either party may

terminate the U.S. Agreement immediately without any notice. (Ex. 1 § 26.) Under the

Canadian Agreements, if any party defaults in the performance of its obligations, upon written

notice the defaulting party is provided with a ten-day period to cure such default. (Ex. 2 § 12;

Ex. 3 § 12.) In the event that the defaulting party cannot cure the default, the non-defaulting

party may terminate the Canadian Agreements immediately upon written notice to the defaulting

party. (*Id.*)

Under certain circumstances, Paymentech has the right to build a cash "reserve" by

withholding a portion of the proceeds of Vertrue's sales drafts as security to protect Paymentech

from exposure in the event it is required to make payments or incur liabilities on Vertrue's

behalf, e.g., in the event Vertrue's chargebacks (defined below) exceed its net proceeds in a

given period. (Ex. 1 §§ 2, 7, 21; Ex. 3 §§ 7, 11.) As of January 2012, Paymentech held

---

[2]     The ACU Business is comprised of the Debtors' credit and identity theft protection and the lifestyle and shopping businesses. According to the Agreed Protocol, the Debtors will continue to operate the ACU Business in the ordinary course, but will cease spending new marketing dollars to acquire new members on a go-forward basis (the "Harvest"). The Harvest is further described in the Declaration of Lorraine DiSanto in Accordance with Local Bankruptcy Rule 1007-2. (ECF Doc. # 3.)

[3]     Paymentech had the option to provide a notice of non-renewal to the Debtors on October 25, 2011, and effectively terminate the Processing Agreements on January 25, 2012.

approximately $10 million of Vertrue's proceeds in reserve, having increased the reserve from $8 million over a period of months leading to the bankruptcy filing.  (Ex. 81.)

### C. VISA's Merchant Risk Monitoring System

In 2007, VISA promulgated certain rules and regulations aimed at controlling merchant risk through greater scrutiny of fraudulent activity or transactions.  Specifically, VISA promulgated the VISA International Operating Regulations (the "VIOR").  (Ex. P4.)  VISA enforces its risk monitoring system via transaction processors like Paymentech, which have direct contractual relationships with both merchants and VISA.  Two factors VISA considers in monitoring merchant risk are a merchant's level of chargebacks,[4] and fraud (the number and dollar value of transactions identified as resulting from fraud, e.g., use of stolen cards).  The banks that issue credit cards determine whether a chargeback or fraudulent transaction occurs based on complaints from cardholders.  VISA measures a merchant's chargeback levels by, among other metrics, its "chargeback ratio"—the dollar volume of the merchant's chargebacks in a given time period divided by the merchant's total sales dollar volume during the period; VISA measures fraud levels by a comparable "fraud ratio."  (Ex. P4 at 754.)  The VIOR identifies a chargeback ratio of 1.0% or more as a benchmark indicating that a merchant may be experiencing an excessive level of chargebacks.  (*Id.* at 762, 768.)

The VIOR do not specify a mandatory fraud ratio for merchants.  Rather, VISA instituted a fraud monitoring program called the Risk Identification System ("RIS"), which identifies merchants that experience fraud ratios equal to or greater than 1.0% in a given month, along with two other identifying factors.  (Ryan Decl. ¶ 8; Matos Depo., 56:11–14.)  Under the revised RIS

---

[4]      A chargeback is a reversal of a sale transaction, such as a return or a refund.  In the event of a chargeback, Paymentech distributes proceeds in the amount of the refund to the issuing bank, which then credits the amount of the refund to the customer's account.  Typically, chargebacks are simply deducted by Paymentech from net proceeds.

guidelines, a merchant (e.g., Vertrue) is notified when in a single month, it experiences a fraud ratio at or above 1.0%, $25,000 or more in reported fraud, and 100 or more fraud transactions. (Ryan Decl. ¶ 8.)  In such a case, where all three conditions are satisfied, VISA places that merchant into a risk monitoring program known as the VISA RIS Online Program ("RIS Online").  (*Id.* ¶ 7.)  To come into compliance, a merchant must then have three consecutive months of processing below the fraud and chargeback threshold parameters.  If a merchant fails to comply, escalating fees (from $10,000 to $100,000 per month) may be assessed against the acquirer or member during a six-month remediation period for each month the merchant remains out of compliance.  (*Id.* ¶ 10)  If at that point the processing has not returned to mandated thresholds, disqualification of the merchant may follow.  (*Id.* ¶ 11.)

### D.  Vertrue's Participation in the RIS Online Program

The genesis of the issues presented in connection with this dispute can be traced back to as early as 2008.  In 2008, VISA placed Vertrue in its RIS Online program because the company's fraud ratio exceeded 1.0%.  (Ex. 9.)  However, over the course of the next three years, Vertrue worked with Paymentech and VISA to implement changes to its consumer marketing, customer sign-up, and payment card acceptance processes in an effort to reduce its fraud ratio and comply with VISA's RIS metrics.  (Suppl. DiSanto Decl. ¶¶ 24–29.)  By August 2011, Vertrue had implemented the recommended remedial measures and achieved a fraud ratio (and chargeback ratio) below 1.0% that month.  (Ex. 36.)  The parties do not dispute that Vertrue's fraud and chargeback ratios have remained below 1.0% since August 2011.

Notwithstanding Vertrue's compliance with VISA's RIS standards, VISA held a meeting with Vertrue and Paymentech on November 14, 2011 to address certain concerns about Vertrue's risk ratios (the "November 14 Meeting").  At the November 14 Meeting, VISA expressed

concern that Vertrue's fraud and chargeback levels remained above what it viewed as optimal

levels.  Therefore, VISA announced that it would impose certain additional "Member Risk

Reduction Requirements," including that Vertrue should achieve "fraud and chargeback ratios"

of .50% (the "50 BP Metric") within 180 days after the November 14 Meeting, *i.e.*, by May 15,

2012.  (Ex. T1.)  VISA stated that if Vertrue failed to meet this 50 BP Metric by May 15, it "*may*

be subject to immediate termination."  (*Id.*) (emphasis added).  The principal issue in the dispute

over lifting the automatic stay is whether the 50 BP Metric is a "requirement" or only a "target."

If it is a requirement and Vertrue failed to comply, would that violate VISA's rules and

regulations, entitling Paymentech to terminate the processing agreements?  If it is only a target,

did a failure to achieve the target violate VISA's rules and regulations?  Was VISA rather than

Paymentech required in the first instance to decide whether Vertrue violated VISA's rules and

regulations?

### E. Paymentech's January 20, 2012 Letter to Vertrue Purporting to Terminate the Processing Agreements

In December 2011, the Debtors failed to make their quarterly interest payments due under

the first and second lien credit facilities, causing an event of default under both credit facilities.

On January 10, 2012, Moody's publicly disclosed the interest payment default and downgraded

its ratings on the first and second lien credit facilities.  Thereafter, on January 20, 2012,

Paymentech sent a letter (the "January 20 Letter") to Vertrue stating that, "effective April 20,

201[2], the [Processing] Agreements will be terminated pursuant to Sections 26 and 27[5] of the

---

[5]        In relevant part, Section 26 of the U.S. Agreement provides that upon the occurrence of any one of the events of default listed in Section 26, Paymentech may terminate the U.S. Agreement without notice.  Section 26(k) of the U.S. Agreement lists, among others, "[Vertrue's] business failure; or a material, adverse change in [Vertrue's] financial condition" as an event of default.  Section 27 of the U.S. Agreement grants certain rights to Paymentech upon Vertrue's default under the U.S. Agreement.  This section is not at issue here.  Section 29 of the U.S. Agreement, entitled "Termination," was not referenced in the January 20 Letter.

US Agreement and Section 11[6] of the Canadian Agreements."[7]  Although Paymentech did not

cite to a specific event of default in the January 20 Letter, the evidence at trial established that

Paymentech sent the January 20 Letter due to the Debtors' default under its loans.  (Ex. 65; Perry

Decl. ¶ 33; Suppl. DiSanto Decl. ¶ 42; Sage Decl. ¶¶ 4–5.)  The Debtors filed their chapter 11

petitions on April 2, 2012 to prevent the threatened termination of the Processing Agreements

while the Debtors endeavored to sell their businesses through an orderly chapter 11 process.

### F.  Nature of the Complaint and the PI Motion

The Debtors seek a finding that the Processing Agreements are executory contracts

within the meaning of section 365(e)(1) of the Bankruptcy Code, and that the Processing

Agreements therefore may not be terminated or modified by Paymentech after the Petition Date

on the basis of Vertrue's financial condition.  Additionally, Vertrue seeks a declaration that

termination of the Processing Agreements by Paymentech would violate the automatic stay under

section 362(a)(3) of the Bankruptcy Code by exercising control over property of the estates.

Furthermore, the Debtors request that the Court issue a permanent injunction enjoining

Paymentech from terminating the Processing Agreements or otherwise failing to honor its

obligations under those agreements until they are assumed or rejected in accordance with section

365(d) of the Bankruptcy Code.

---

[6]     Section 11 of the Canadian Agreements permits Paymentech, upon a material change in Vertrue's financial condition, to stop processing Vertrue's sales records and refunds, and to retain some or all of Vertrue's sales proceeds to increase the Reserve Account.  Section 11 of the Canadian Agreements does not, however, permit Paymentech to actually terminate the Canadian Agreements.

[7]     On January 23, 2012, Paymentech sent an additional letter to Vertrue correcting a typographical error in the January 20 Letter: "The letter stated that notice was being provided that, effective April 20, 2011, the Merchant Agreements would be terminated.  The effective date should have read 'April 20, 2012.'"  (Ex. 71.)

### G.  Motion to Lift the Automatic Stay

If the Processing Agreements were not effectively terminated prepetition, Paymentech seeks entry of an order pursuant to section 362(d) of the Bankruptcy Code, granting Paymentech relief from the automatic stay to exercise its contractual rights to terminate the Processing Agreements.  Paymentech argues that Vertrue violated VISA's rules and regulations through its failure, by May 15, 2012, to maintain "fraud and chargeback ratios" below the 50 BP Metric. According to Paymentech, Vertrue violated section 9 of the U.S. Processing Agreement (requiring compliance with card network "rules and regulations") and triggered an event of default pursuant to section 26 of the U.S. Processing Agreement.  Therefore, according to Paymentech, this non-monetary default and the ramifications it will have on Paymentech's reputation with VISA constitutes "cause" to permit lifting the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code.

In response to the Lift-Stay Motion, the Debtors argue that no VISA rule or regulation requires a merchant to maintain fraud or chargeback ratios at or below 50 BP; rather, VISA has established a maximum 1.0% (100 BP) fraud ratio.  Second, according to the Debtors, the Processing Agreements do not otherwise require Vertrue to maintain fraud or chargeback ratios at or below 50 BP.  Third, the Debtors argue that Paymentech has never imposed a 50 BP Metric on any of its approximately 250,000 customers and never terminated a merchant's processing contract because of a merchant's fraud ratios.  Additionally, both the Debtors and Paymentech agree that Vertrue has maintained fraud and chargeback ratios below 1.0% continuously since August 2011.  For these reasons, among others, the Debtors argue that Paymentech has failed to show that "cause" exists warranting lifting the automatic stay.

12

## II.    DISCUSSION

### A.  The Debtors Are Entitled to Injunctive Relief

#### 1.  The Preliminary Injunction Hearing is Consolidated with Trial on the Merits

Over the last two months, the parties engaged in extensive discovery and pretrial

proceedings.  A three-day trial was scheduled to hear the PI Motion in the Adversary Proceeding

and the Lift-Stay Motion in the main case.  In light of the nature and importance of the issues to

both parties, and the amount of discovery and trial preparation that had taken place, on June 21,

2012, prior to the final pretrial conference, the Court asked counsel whether they would consent

to consolidation of the preliminary injunction hearing with trial on the merits pursuant to Fed. R.

Civ. P. 65(a)(2), made applicable to this case by Fed. R. Bankr. P. 7065.  Vertrue and

Paymentech consented to consolidation.  On June 26, 2012, the Court commenced the trial of the

Adversary Proceeding, seeking a permanent injunction and declaratory relief, and of the Lift-

Stay Motion.  Thus, at this stage in the Adversary Proceeding the Court must determine whether

the Debtors have shown, by a preponderance of the evidence, that they are entitled to a

permanent injunction.  "The standard for the issuance of a permanent injunction is essentially the

same as that for a preliminary injunction except that for the former, plaintiff must prove actual

success on the merits *and* irreparable harm."  *Wojnarowicz v. Am. Family Ass'n*, 745 F. Supp.

130, 145 n.13 (S.D.N.Y. 1990) (emphasis added); *see also Roach v. Morse*, 440 F.3d 53, 56 (2d

Cir. 2006); *Evergreen Solar, Inc. v. Barclays PLC (In re Lehman Bros. Holdings, Inc.)*, No. 08-

01633, 2011 WL 722582, at *8 (Bankr. S.D.N.Y. Feb. 22, 2011).  Quoting from a Supreme

Court decision, Judge Gerber set forth the standards for issuance of a permanent injunction in the

federal courts:

> [A] plaintiff seeking a permanent injunction must satisfy a four-
> factor test before a court may grant such relief.  A plaintiff must

13

> demonstrate: (1) that it has suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and defendant, a remedy
> in equity is warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

*In re Adelphia Comm'cns Corp.*, 345 B.R. 69, 84 (Bankr. S.D.N.Y. 2006) (quoting *eBay Inc. v.*

*MercExchange, L.L.C.*, 126 S.Ct. 1837, 1838 (2006)).

In this case, to obtain permanent injunctive relief, the Debtors must first prevail on the

merits of their case. Specifically, the Debtors must demonstrate that: (i) the Processing

Agreements are executory contracts and were not terminated on January 20, 2012; (ii) Vertrue's

continued rights under the Processing Agreements are substantial assets of the estate, and any

termination of those rights implicates the automatic stay; and (iii) the basis for Paymentech's

purported termination of the Processing Agreements was a material adverse change in Vertrue's

financial condition, such that section 365(e)(1) of the Bankruptcy Code prohibits such

termination from being effectuated post-petition.

As an initial matter, the Court only needs to reach the Lift-Stay Motion if it finds that the

January 20 Letter did not terminate the Processing Agreements before the Petition Date.

However, in light of the evidence presented and for the reasons discussed below, the Court finds

that the Debtors have established by a preponderance of the evidence that the Processing

Agreements are executory contracts that are property of the estate; Paymentech did not terminate

the Processing Agreements before the bankruptcy filing; Paymentech sought to terminate the

Processing Agreements post-petition based on an unenforceable *ipso facto* clause; the Debtors

will suffer irreparable injury if the Processing Agreements are terminated; and a permanent

injunction in favor of the Debtors is warranted in this case. As explained in section II.B., *infra*,

14

the Court finds that Paymentech has failed to show by a preponderance of the evidence that

cause exists to lift the automatic stay, and, therefore, the Court denies the Lift-Stay Motion.

### 2.  The January 20 Letter Does Not Establish Paymentech's
###     Immediate Intent to Terminate the Processing Agreements

Paymentech argues that the Processing Agreements are no longer executory contracts

because they were terminated either prepetition or on April 27, 2012[8] pursuant to the January 20

Letter.  Upon the Petition Date, according to Paymentech, only the passage of time was

necessary for the Processing Agreements to be terminated, and no further action was required by

Paymentech.

Paymentech relies on a clause in the January 20 Letter as proof that it intended to

terminate the Processing Agreements immediately.  The January 20 Letter states that "effective

April 20, 201[2], the [Processing] Agreements will be terminated pursuant to Sections 26 and 27

of the US Agreement and Section 11 of the Canadian Agreements."  (Ex. 66.)  In relevant part,

section 26 of the U.S. Agreement provides that upon the occurrence of any one of the events of

default listed in section 26, Paymentech may terminate the U.S. Agreement without notice.

Section 26(k) of the U.S. Agreement lists, among others, "[Vertrue's] business failure; or a

material, adverse change in [Vertrue's] financial condition" as an event of default.  Section 27 of

the U.S. Agreement grants certain rights to Paymentech upon Vertrue's default under the U.S.

Agreement.  This section is not at issue here.  Section 29 of the U.S. Agreement, entitled

"Termination," was not referenced in the January 20 Letter.  Section 11 of the Canadian

Agreements permits Paymentech, upon a material change in Vertrue's financial condition, to

stop processing Vertrue's sales records and refunds and retain some or all of Vertrue's sales

---

[8]     Although the January 20 Letter stated that the Processing Agreements will be terminated effective April 20,
20, 2012, during post-petition negotiations between the parties, Paymentech agreed to suspend its plans to attempt a
termination until April 27, 2012.

15

proceeds to increase its reserve.  Section 11 of the Canadian Agreements does not, however, permit Paymentech to terminate the Canadian Agreements.

Paymentech argues that the January 20 Letter evinced an intent immediately to terminate the Processing Agreements, subject only to the passage of ninety days.  Vertrue argues that, at most, the January 20 Letter evinced Paymentech's intent to terminate the Processing Agreements on April 20, 2012, and not before, and only then if Paymentech carried through on its threat depending on future developments.  The Court finds and concludes that a preponderance of the evidence supports Vertrue's interpretation of the letter.   The language of the letter supports Vertrue's position—"the [Processing] Agreements *will be terminated*"—but even assuming that the letter is ambiguous, extrinsic evidence overwhelmingly establishes that the January 20 Letter did not result in a prepetition termination of the Processing Agreements.

Where a document "is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (internal citations omitted). While the January 20 Letter was not a contract, principles applicable to contract interpretation nevertheless are helpful in construing the letter.  Where a contract is ambiguous on its face, extrinsic evidence is admissible.  *See In re Robert C. Nargassans*, 103 B.R. 446, 450 (Bankr. S.D.N.Y. 1989) (citing 3 N.Y. JUR. 2D AGENCY § 276 (1980)).  In assessing ambiguity, the Court must consider the entire document subject to a dispute to "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).  The terms of a document are not ambiguous if they "have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d at 314

16

(citing *Sayers*, 7 F.3d at 1095).

Both parties agreed that the U.S. Agreement could have been terminated immediately, prepetition, without any notice based on a material adverse change in the Debtors' financial condition. (Hr'g Tr., June 26, 2012, 18:5-12, 46:18-24.)  What then is the effect of the January 20 Letter?  Paymentech argues that the letter should be construed as a termination of the U.S. Agreement as of January 20, 2012, with the wind-down of post-termination obligations by April 27, 2012.  No such notice was required under the U.S. Agreement, but ten days' notice was required under the Canadian Agreements.  (Ex. 1 § 26; Ex. 2 § 12; Ex. 3 § 12.)  The January 20 Letter did not specify the reason for Paymentech's purported termination; it merely cites to two sections of the U.S. Agreement that list a number of possible events of default and a section of the Canadian Agreement that does not actually permit Paymentech to terminate the Canadian Agreements.  Most importantly, the January 20 Letter states that the Processing Agreements "*will be terminated,*" not that they are terminated.  Thus, on its face, the January 20 Letter does not evidence a clear and unambiguous intent to terminate or reason for termination, and extrinsic evidence may be reviewed by the Court to determine Paymentech's intent and the effect of the January 20 Letter.

In *Morris Silverman Management Corporation v. Western Union Financial Services*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003), Morris Silverman Management Corporation ("Morris Silverman") and Western Union Financial Services ("Western Union") were parties to a contract that provided for an initial term of six years that "was to remain in force thereafter unless either party exercised a right to terminate by giving at least twelve months' notice to the other party." *Id.* at 969.  In October 1999, Western Union provided written notice to Morris Silverman to

terminate the agreement at the end of the term.  However, in other communications it implied

that it intended to continue a business relationship.  *Id*. at 972.

Morris Silverman alleged that the ongoing negotiations concerned an extension of the

agreement, while Western Union alleged that the negotiations concerned a new contract.  *Id*.

The court found that:

> The general rule is that, to be effective, a notice terminating a
> contract must be clear and unequivocal.  The focus is on whether
> the notice is sufficiently clear to apprise the other party of the
> action being taken.  The related conduct of the parties, including
> conduct between the giving of notice and the actual date of
> termination, may be considered in determining whether there has
> been a clear and unequivocal termination.

*Id.* at 974 (internal citations omitted).

Here, Paymentech's emails to the Debtors and internal documents show that the

purported termination was reversible in Paymentech's own discretion.  Specifically,

Paymentech's January 29, 2012 Full Periodic Review Form states that the termination would

occur "if an arrangement is not made before [April 20, 2012] to retain the merchant."  (Ex. 80.)

Additionally, on conference calls with Vertrue before and after sending the January 20 Letter,

representatives from Paymentech informed Vertrue that Paymentech had no intention of

terminating the Processing Agreements and instead would continue to work with Vertrue through

its sale process.  (Suppl. DiSanto Decl. ¶ 42; Perry Decl. ¶ 33.)  The Debtors have offered into

evidence numerous emails from January 2012 through March 2012 that show Paymentech did

not intend to terminate the Processing Agreements and was likely trying to protect itself in the

event of a bankruptcy filing.[9]  (*See* Ex. 70; Ex. 72; Ex. 90; Ex. 101.)  The most striking evidence

---

[9]      In another email offered by the Debtors, the Senior Director of Credit/Risk Management at Paymentech
informed another Paymentech employee that as of January 13, 2012, the "[r]eserve is continuing to build at this time
and there should be no issue with preference period."  (Ex. 62.)  The same sentiment was echoed by Paymentech's
Chief Risk Officer for North America in an email on January 12, 2012.  (Ex. 59.)

of Paymentech's intent to continue performing under the Processing Agreements was presented

to the Court in the form of an email dated April 13, 2012 from Heidi Biesterveld, Paymentech's

Vice President of Credit Risk/Management, to Lorraine DiSanto, the Chief Financial Officer and

Chief Operating Officer of Vertrue.  In that email, Ms. Biesterveld asked Ms. DiSanto when she

would like to "have a business level discussion with the lenders about the contract assumption

points."  (Ex. 117.)  If Paymentech had actually intended to terminate the Processing Agreements

on January 20, 2012 or April 27, 2012, Paymentech representatives would not have sought

"business level discussions" with Vertrue's lenders regarding assuming the Processing

Agreements.[10]

On January 20, 2012, Paymentech clearly intended to preserve the right and option to

terminate the Processing Agreements ninety days in the future depending on future events.  But

bankruptcy intervened and, as explained below, section 365(e)(1) prevents Paymentech from

terminating the Processing Agreements based on a material adverse change in the Debtors'

financial condition.  None of the authorities Paymentech cited dictates a contrary result.  In

virtually all of those cases, it was undisputed that the contract at issue had been validly

terminated prepetition or was unequivocally scheduled to terminate after the petition date,

leaving only the passage of time to occur before the termination became effective.  *See Moody v.*

*Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984); *In re Margulis*, 323 B.R. 130, 133 (Bankr.

---

[10]    Biesterveld signed the January 20 Letter.  She testified at trial in the form of three declarations introduced by Paymentech, deposition designations (and accompanying video of the deposition) offered by Vertrue, and cross-examination and redirect examination during the trial.  It was not until Biesterveld's third declaration that she said she told Vertrue that the processing agreements were terminated immediately on January 20, 2012.  (Suppl. Biesterveld Decl. ¶ 28.)  In that same declaration, Biesterveld actually contradicted herself by later stating that the January 20 Letter terminated the Processing Agreements, "effective April 20, 2012."  (*Id.* ¶ 29.)  Biesterveld's testimony was also substantially impeached by her own email.  (*See* Ex. 117) (seeking a "business level discussion with the lenders about contract assumption" on April 13, 2012).  Biesterveld's testimony was further contradicted by internal Paymentech emails (*see* Ex. 70; Ex. 73; Ex. 90; Ex. 104) and by the testimony of Lorraine DiSanto (*see* Hr'g Tr., June 26, 2012, 195:5–9, 197:11–21, 198:17–24).  After hearing, reading and observing Biesterveld's testimony, the Court expressly finds that her testimony that she told Vertrue that the processing agreements were terminated on January 20, 2012 was not credible.  Her testimony appeared scripted, her demeanor was hostile, and she was evasive and avoided answering the questions she was asked.

S.D.N.Y. 2005); *Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.)*, 163 B.R. 927, 938 (Bankr.

E.D.N.Y. 1994); *COMP III, Inc. v. Computerland Corp. (In re COMP III, Inc.)*, 136 B.R. 636,

639 (Bankr. S.D.N.Y. 1992); *LJP, Inc. v. Royal Crown Cola Co.*, 22 B.R. 556, 558 (Bankr. S.D.

Fla. 1982); *In re Nashville White Trucks, Inc.*, 5 B.R. 112, 114 (Bankr M.D. Tenn. 1980).

Moreover, whether a party's conduct has terminated an agreement depends on the

agreement's terms—specifically, whether the contractual termination provision represents a

conditional limitation or a condition subsequent.  "[I]f a clause in a contract provides that the

contract will end at the moment a particular designated event happens, that clause creates a

conditional limitation," and the contract automatically terminates upon the occurrence of the

event.  *In re St. Casimir Dev. Corp.*, 358 B.R. 24, 38 (S.D.N.Y. 2007).  If a contract contains a

"condition subsequent," termination is not automatic and the party seeking to do so must take

some affirmative action after the designated event occurs to terminate the agreement.  *Id.* at 39

(stating that a condition subsequent exists "where a party has the option either to terminate the

contract upon the occurrence of an event or not to terminate—and where the contract does not

expire by its own limitation upon such occurrence").  So long as termination remains reversible

or in the discretion of the counterparty, as opposed to being automatic upon the occurrence of

specific event, a condition subsequent exists.  *Id.*

Here, the U.S. Processing Agreement does not contain a conditional limitation clause,

terminating the contract solely after the passage of time following an event of default.  In the

absence of such a clause, Paymentech seeks unilaterally to create a contractual conditional

limitation clause through the guise of the January 20 Letter.  Here, the U.S. Processing

Agreement gives Paymentech the "option either to terminate the contract upon the occurrence of

an event [of default] or not to terminate . . . [but it] does not expire by its own limitation upon

such occurrence[.]" *St. Casimir*, 358 B.R. at 39.

Paymentech argues that in sending the January 20 Letter, it gave Vertrue ninety days'
notice in an attempt to be commercially reasonable.  However, in sending the January 20 Letter,
Paymentech actually failed to comply with the terms of the Processing Agreements.  The U.S.
Agreement provides that Paymentech "may terminate" upon the occurrence of an event of
default without any notice.  The Canadian Agreements, as discussed, require Paymentech to
provide ten days' notice of termination with an opportunity to cure upon the occurrence of an
event of default.  The January 20 Letter, stating that the Processing Agreements "will be
terminated," is effectively a legal nullity in this case.[11]  Paymentech was not required to send
such notice; it was required to either terminate the agreements immediately or continue to
perform under the agreements.  Furthermore, the preponderance of the evidence at trial
established that Paymentech and Vertrue continued to perform under the Processing Agreements
as if they were not terminated.

The Court finds that Paymentech's actions both before and after sending the January 20
Letter evidence an intent not to terminate the Processing Agreements on January 20, 2012.  The
evidence establishes that Paymentech was seeking to continue working with Vertrue and any
possible purchaser of Vertrue's business.[12]  (Ex. 80; Ex. 117.)  Based on those actions, the
Processing Agreements were not terminated on January 20, 2012; nor does it appear that
Paymentech intended to terminate them on April 27, 2012.

---

[11]     If Paymentech wanted to terminate the Processing Agreements on April 27, 2012 (after the Petition Date),
more was required on Paymentech's part than merely awaiting the passage of time.  Since the January 20 Letter did
not comply with the terms of the Processing Agreement, to terminate the Processing Agreements, Paymentech had
to actually effectuate a termination, which it was prohibited from doing after the Petition Date because of the
automatic stay.

[12]     The Processing Agreements were quite lucrative for Paymentech, generating revenue of several hundred
thousands of dollars each month.

### 3. Terminating the Processing Agreements Post-Petition on the Basis of the Debtors' Financial Condition is Prohibited

The language of the January 20 Letter was purposefully unclear about the basis for the purported termination. A preponderance of the evidence at trial, however, establishes that the reason for the purported termination was a material adverse change in the Debtors' financial condition as a result of the missed December 2011 interest payment and the resulting downgrade by Moody's. Although the January 20 Letter references section 26 of the U.S. Agreement, section 26 contains numerous events of default, some of which could not be relied upon in the event of bankruptcy. Notably, on January 4, 2012, responsibility for the Vertrue account transitioned from Paymentech's Chief Risk Officer, who is responsible for monitoring Vertrue's fraud and chargeback ratios, to Paymentech's Vice President of Credit and Risk Management, who is responsible for monitoring merchants that are close to filing or have already filed bankruptcy petitions. (Ex. 57.) Additionally, prior to drafting the January 20 Letter, Ms. Biesterveld directed one of her subordinates to "[r]eference section 26(k) for the MAC clause" in the January 20 Letter. (Ex. 65.) Further, both Ms. DiSanto and Michael J. Sage, the Debtors' bankruptcy counsel, testified that they were told on numerous occasions that the reason for Paymentech's termination was in response to Vertrue's default under its credit facilities and its subsequent ratings downgrade. (Suppl. DiSanto Decl. ¶ 42; Sage Decl. ¶ 4.) Paymentech has offered no credible evidence to rebut these facts.

The January 20 Letter's reference to section 11 of the Canadian Agreements further evidences Paymentech's reliance on a "material change in [Vertrue's] financial condition . . . ." (Ex. 2 § 11; Ex. 3 § 11.) Additionally, the fact that Paymentech had not sent a termination notice to Vertrue during its time in RIS Online and subsequent to the November 2011 meeting with VISA further supports the fact that Paymentech did not rely on Vertrue's fraud and chargeback

22

ratios or VISA's rules and regulations in support of its attempted termination of the Processing

Agreements.  The evidence thus unequivocally shows that when Paymentech sent the January 20

Letter, it intended to rely entirely upon *ipso facto* provisions to terminate the Processing

Agreements.  Since, as discussed above, the January 20 Letter was not an effective, *immediate*,

or valid termination of the Processing Agreements on January 20, 2012, Paymentech could not

effectuate a termination of the Processing Agreements post-petition based on a material adverse

change in Vertrue's financial condition.  Terminating the Processing Agreements based on a

material adverse change in Vertrue's financial condition after the Petition Date is prohibited by

section 365(e)(1) of the Bankruptcy Code.  *See* 11 U.S.C. § 365(e)(1).[13]

### 4. The Processing Agreements are Executory Contracts and Substantial Assets of the Debtors' Estates

Pursuant to section 365 of the Bankruptcy Code, a debtor may assume or reject executory

contracts or unexpired leases.  11 U.S.C. § 365  Although the Bankruptcy Code does not define

the term "executory contracts," it generally includes contracts "on which performance remains

due to some extent on both sides."  *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 n.6 (1984)

(citing H.R. Rep. 95-595, 347 (1978)).  Courts evaluate the status of the contract as of the

petition date to determine if it is executory or not.  Other courts have adopted a functional

analysis whether a contract can be assumed or rejected based on whether a debtor or estate will

---

[13]        Section 365(e)(1) provides:

> Notwithstanding a provision in an executory contract or unexpired lease, or in
> applicable law, an executory contract or unexpired lease of the debtor may not
> be terminated or modified, and any right or obligation under such contract or
> lease may not be terminated or modified, at any time after the commencement of
> the case solely because of a provision in such contract or lease that is
> conditioned on-
> (A)        the insolvency or financial condition of the debtor at any time before
> the closing of the case;
> (B)        the commencement of a case under this title; or
> (C)        the appointment of or taking possession by a trustee in a case under this
> title or a custodian before such commencement.

benefit from the assumption or rejection. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 687, 707–10 (Bankr. S.D.N.Y. 1992). Paymentech's counsel conceded during trial that the Processing Agreements are executory contracts if they were not effectively terminated prepetition. (Hr'g Tr., June 28, 2012, 106:10–20; *see also* Lift Stay Mot. ¶¶ 21–22.) Even without the admission, the Court concludes that on the Petition Date, the Processing Agreements were, in fact, executory contracts that could be assumed pursuant to section 365 of the Bankruptcy Code.

The issue whether a credit-card-processing agreement is an executory contract and could be assumed under section 365 has been litigated in other circuits. Most notably, in *In re United Airlines, Inc.*, 368 F.3d 720 (7th Cir. 2004), Judge Easterbrook found that a credit-card-processing agreement that had not been terminated prior to the petition date remained an executory contract pursuant to section 365 of the Bankruptcy Code. Judge Easterbrook further found that the credit-card-processing agreement, similar to the Processing Agreements here, was not a "financial accommodation" and, therefore, the Debtor was not barred from assuming it pursuant to section 365(c)(2) of the Bankruptcy Code. *See id.* at 724–25.

Since the Court has concluded that the January 20 Letter did not effectively terminate the Processing Agreements prior to the Petition Date, the Processing Agreements remain enforceable contracts. Paymentech is still obligated to process credit-card transactions on behalf of and remit payment to Vertrue; and Vertrue is still obligated to pay certain fees to Paymentech and otherwise comply with its obligations to Paymentech under the Processing Agreements.

Additionally, the Processing Agreements are significant assets of the Debtors' estates. Accordingly, termination would significantly impede the Debtors' ability to restructure, if not eliminate the possibility of a successful restructuring entirely, and impair creditor recoveries.

*See Thomas B. Hamilton Co. Inc. v. Citizens and S. Nat'l Bank (In re Thomas B. Hamilton Co. Inc.)*, 969 F.2d 1013, 1020 (11th Cir. 1992) ("The Agreement at issue here is typical of credit card merchant agreements between all kinds of merchants and merchant banks.  If these agreements may not be assumed by the trustee following a bankruptcy filing, rehabilitation will be virtually impossible for any merchant who relies heavily on credit card sales.")

### 5.  The Debtors have Shown by a Preponderance of the Evidence that They Will Suffer Irreparable Injury and Are Entitled to a Permanent Injunction

As discussed above, the Court concludes that the January 20 Letter did not effectively and immediately terminate the Processing Agreements and could not terminate those agreements after the Petition Date.  The next issue the Court must address is whether the Debtors have shown, by a preponderance of the evidence, that they will suffer irreparable injury and are entitled to a permanent injunction, enjoining Paymentech from terminating the Processing Agreements.

A preponderance of the evidence at trial establishes that the Debtors have already suffered irreparable injury by reason of the threatened termination of the Processing Agreements. If Paymentech were permitted to terminate the Processing Agreements, the Debtors' chapter 11 cases would effectively fail.  Paymentech processes 95% of Vertrue's credit-card transactions. More than 55% of Vertrue's monthly revenues come from members who pay for Vertrue's products and services with VISA payment cards processed through Paymentech.  *See In re Thomas B. Hamilton Co. Inc.*, 969 F.2d at 1020.  The evidence further establishes that because of the dispute in this litigation with Paymentech, Vertrue has been unable to find a substitute credit-card processor in place of Paymentech.  (Hr'g Tr., June 27, 2012, 71:9–14.)

As further evidenced by the testimony of Michael J. Sage, Paymentech's actions thus far have already damaged creditors' prospects for recoveries in this case.  By sending the January 20

Letter one day after the deadline for potential acquirers to submit first-round bids for Vertrue,

Paymentech disrupted the prepetition auction process that could have staved off a bankruptcy

filing. The January 20 Letter "created uncertainty" among the potential bidders and had a

"negative effect" on the pre-petition marketing process. (Hr'g Tr., June 27, 2012, 101:9–

102:16.) The harm caused by the January 20 Letter and the prospective harm that could be

caused by the termination of the Processing Agreements is clearly irreparable and immediate.

The Court further finds that there are no adequate remedies at law, such as monetary

damages, that could compensate the Debtors for the harm that they will suffer if Paymentech

terminates the Processing Agreements. The January 20 Letter was a significant factor in the

failure of the prepetition marketing and sale of the Debtors' business. Additionally, if

Paymentech is now permitted to terminate the Processing Agreements, the sale process currently

underway would be severely impacted, thwarting any prospective recovery for creditors in this

case. The Court finds that such harms are unquantifiable and thus monetary relief would be

extremely difficult if not entirely impossible to obtain.

With respect to the balance of hardships, the Court finds that the balance is

extraordinarily one-sided. The Debtors' businesses and any chance for an orderly sale process

would suffer immediate and irreparable harm if Paymentech terminated the Processing

Agreements. Although Paymentech lists a parade of hardships that it may experience if it does

not terminate the Processing Agreements immediately, these potential hardships are, at best,

hypothetical and speculative. Specifically, Paymentech argues that VISA may terminate its

relationship with Paymentech if Paymentech does not terminate the Processing Agreements.

However, VISA has only stated that Vertrue "may be subject to immediate termination" if it does

not comply with the 50 BP Metric, among other conditions. (Ex. 47.) If VISA terminated its

relationship with Paymentech it would damage its relationship with the world's third largest

transaction processor and the world's largest card issuer.  This termination would result in

disconnecting from the VISA system the merchants whose transactions are processed through

Paymentech, including Wal-Mart, Sears, and merchants responsible for 50% of all internet sales.

(Biesterveld TRO Decl. ¶ 4.)  VISA has not threatened to terminate Paymentech; and it is highly

doubtful that VISA would or could take such drastic actions against Paymentech—effectively

cutting off its nose to spite its face—without VISA having followed its own procedures and first

directing Paymentech not to accept additional sales drafts from Vertrue, something VISA has not

done.

Finally, the Court finds that the public interest would not be harmed if a permanent

injunction was issued in this case.

### 6. The Court May Enter a Final Judgment Granting Declaratory Relief and a Permanent Injunction Against Termination of the Processing Agreements

Having determined that a permanent injunction should be issued, preventing Paymentech

from terminating the Processing Agreements, the Court must decide whether it can enter a final

judgment to that effect.  The issues raised by the Adversary Proceeding unquestionably raise

issues within the bankruptcy court's "core jurisdiction" under 28 U.S.C. § 157(b).

The determination whether something is property of the estate is a core matter.  *See, e.g.*,

*Pension Benefit Guar. Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 138 B.R. 442,

445 (D. Del. 1992) (concluding that determination regarding property of the estate is core);

*Schroeder v. New Century Holdings, Inc. (In re New Century Holdings, Inc.)*, 387 B.R. 95, 105

(Bankr. D. Del. 2008) (concluding that matters requiring declaration whether property is

property of the estate are core); *Koken v. Reliance Grp. Holdings, Inc. (In re Reliance Grp.

Holdings, Inc.)*, 273 B.R. 374, 394–95 (Bankr. E.D. Pa. 2002) (proceeding to determine whether

certain property rights are property of the estate under section 541 is core, even if determination rests upon interpretation of state law); *Knopfler v. Schraiber (In re Schraiber)*, 97 B.R. 937, 939–40 (Bankr. N.D. Ill. 1989) (concluding that bankruptcy court has core jurisdiction to determine what property of estate is and can apply state law).  Determining whether a contract is property of the estate is also necessary before determining whether a contract may be assumed or rejected, which is likewise a determination within the "core" jurisdiction of the bankruptcy court.  *See In re Helm*, 335 B.R. 528, 531 (Bankr. S.D.N.Y. 2006) ("Motions to assume or reject executory contracts are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), as 'matters concerning the administration of the estate' and 'other proceedings affecting the liquidation of the assets of the estate . . . .'"); *Toledano v. Kittay (In re Toledano)*, 299 B.R.284, 293 (Bankr. S.D.N.Y. 2003) (finding that a debtor's legal interests in her lease were property of the estate and could thus be assumed pursuant to section 365).

After the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), determining that a matter falls within the bankruptcy court's core jurisdiction is not the end of the inquiry however, as there are certain core matters in which a bankruptcy court may not enter a final judgment consistent with Article III of the U.S. Constitution.  No such limitation or prohibition applies to the issues resolved in the Adversary Proceeding.

In *In re Salander O'Reilly Galleries*, 453 B.R. 106 (Bankr. S.D.N.Y. 2011), the court held that the bankruptcy court had the constitutional authority to enter a final judgment whether artwork consigned to the debtor was property of the estate, even if making that determination required the bankruptcy court to apply state law.  The court stated:

> whether the [artwork] was property of the debtor at the time the case was commenced . . . is an essential and inseparable element of an action under Bankruptcy Code § 544(a).  Resolution of the § 544 matter will go to the heart of whether [the creditor's] claim

> will be allowed.  [The creditor's] requested relief [from the stay to
> permit it to arbitrate the ownership issue] is inextricably bound up
> with the resolution of . . . [the] proof of claim it filed in this case . .
> . .  [T]he Court will have to determine whether the Debtor and the
> estate had an interest in the [artwork], as part of determining the
> order of the priorities of the competing interests in the work of art,
> as well as whether [the creditor's] claim may be allowed.

*Id.* at 115.

Similarly, here, the Court must determine whether the Processing Agreements remained property of the estate after the bankruptcy petitions were filed.  This is an essential part of administration of the bankruptcy estate and stems from the bankruptcy itself.  *See* 28 U.S.C. § 157(b)(2)(A); *see also Olivie Dev. Grp. LLC v. Park*, No. C11-1691Z, 2012 WL 1536207, at *4 (W.D. Wash. Apr. 30, 2012) ("Here, the Bankruptcy Court's Order makes a factual finding about the parties' interest in [a] security deposit so that the court could determine the issue of whether that deposit was part of the bankruptcy estate.  This necessary finding does not convert the core issue of whether something is property of the estate into a non-core proceeding. . . . This finding did not adjudicate any independent right of the appellees outside bankruptcy. . . . *Stern* did not hold that a bankruptcy judge lacks authority to enter judgment regarding what property is included in the estate.  [Debtors'] reliance on *Stern* is therefore misplaced."); *BankUnited Fin. Corp. v. FDIC (In re BankUnited Fin. Corp.)*, 462 B.R. 885, 893–94 (Bankr. S.D. Fla. 2011) ("Contrary to the FDIC-R's argument, what is or is not property of a bankruptcy estate is an issue that stems from the bankruptcy itself . . . since the concept of what is property of a bankruptcy estate does not exist outside of a bankruptcy case.  Moreover, the fact that the determination of whether the Tax Refunds are property of the estate is determined under non-bankruptcy law and is an issue that could be resolved in a non-bankruptcy forum is irrelevant since the issue of what is property of the estate is virtually always a matter of state law or other non-bankruptcy law."); *Szilagyi v. Chi. Am. Mfg., LLC (In re Lakewood Eng'g & Mfg. Co.)*, 459

29

B.R. 306, 312 (Bankr. N.D. Ill. 2011) ("[T]he principal issues in the adversary proceeding are

whether [Chicago American Manufacturing, LLC] has a valid license to use certain Lakewood

marks and patents under Illinois law and whether any such license was terminated when the

Bankruptcy Court approved the rejection of CAM's purported license under 11 U.S.C. § 365. . . .

[T]his court is ruling only on claims 'derived from or dependent upon bankruptcy law,' unlike

the state law tort action at issue in *Stern* . . . . In the course of this Memorandum Opinion, this

court interprets a contract under principles described in Illinois law, and then determines the

effect of rejection of that contract under bankruptcy law. Rejection of a contract and the effects

thereof are creations purely of bankruptcy law. This action clearly 'stems from the bankruptcy

itself.'").

### B. Paymentech Has Not Adequately Shown that Cause Exists to Lift the Automatic Stay

The commencement of a bankruptcy case imposes an automatic stay on all litigation

against the debtor. 11 U.S.C. § 362(a). However, pursuant to section 362(d) of the Bankruptcy

Code, a party in interest can seek relief from the automatic stay. Section 362(d), in relevant part,

provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-
> (1) for cause including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if
>> (A) the debtor does not have an equity in such property; and
>> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d).

The Second Circuit has observed that "[n]either the statute nor the legislative history defines the term 'for cause.'" *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1285 (2d Cir. 1990). The Court's determination of whether cause has been shown "depends upon the facts underlying a given motion." *In re Bogdanovich,* 292 F.3d 104, 110 (2d Cir. 2002).

Here, the Court has concluded that the Processing Agreements are executory contracts that are property of Vertrue's estate; these agreements were not terminated before the Petition Date. Thus, the only issue presented in the Lift-Stay Motion is whether Paymentech has demonstrated "cause" to lift the automatic stay to terminate the Processing Agreements. In the Lift-Stay Motion, Paymentech asserts that Vertrue committed a material, non-curable, non-monetary default under the Processing Agreements by failing to meet the 50 BP Metric by May 15, 2012. For the reasons explained below, the Court finds that the failure to meet the 50 BP Metric does not constitute "cause" under section 362(d) of the Bankruptcy Code. Additionally, even if the Court did find that "cause" exists, "based on a balance of the harms and equities," the Court would not modify the automatic stay and allow Paymentech to terminate the Processing Agreements. *In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 138 (S.D.N.Y. 2010) (citing *Sonnax*, 907 F.2d 1286).

### 1.  **The 50 BP Metric Was a *Target* and Not a *Requirement***

First, Paymentech contends that Vertrue violated section 9 of the U.S. Processing Agreement, which requires Vertrue "to comply with all rules and regulations of [VISA]." Paymentech asserts that, as of November 14, 2012, Vertrue was subject to a VISA rule or regulation requiring it to obtain fraud and chargeback ratios of .50% by May 15, 2012. (Ex. T1; Ex. 47.) Based upon a preponderance of the evidence at trial, the Court finds that the 50 BP

31

Metric was, in fact, a target and not a requirement that Vertrue had to abide by to avoid

termination. Specifically, at the November 14 Meeting and in letters addressed to Paymentech

on November 17, 2011, January 27, 2012, February 24, 2012, and April 25, 2012, VISA stated

that "Vertrue *may* be subject to termination" if it did not achieve the 50 BP Metric by May 15,

2012. (Ex. T1; Ex. 47; Ex. 77; Ex. 92; Ex. 133) (emphasis added). After May 15, 2012, VISA

did not advise Paymentech to stop accepting drafts from Paymentech. Additionally, on May 21,

2012, VISA sent another letter to Paymentech and specifically referred to the 50 BP Metric as a

"target." (Ex. 151.) VISA further advised that it would continue to "consider this situation, and

reserves all of its rights and remedies in this regard." (*Id.*) Through these letters, VISA *did not*

determine that Vertrue was in violation of its rules or regulations, direct Paymentech to stop

processing Vertrue's sales drafts, or direct Paymentech to terminate Vertrue. Therefore, the

Court determines that the 50 BP Metric is a target that VISA imposed on Vertrue, rather than a

fixed requirement.[14] Failure to comply with this target, without more, is not a violation of

VISA's rules and regulations under the Processing Agreements and does not constitute "cause"

to lift the automatic stay.[15]

---

[14]     Lorraine DiSanto testified at trial that the only fraud ratio VISA imposed on Vertrue or would likely impose on any purchaser of Vertrue's business was 1.0%. (Hr'g Tr., June 26, 2012, 248:1–250:15.) DiSanto's testimony was not entirely persuasive. Vertrue's trial counsel acknowledged that VISA could impose Member Risk Reduction Requirements with a RIS below 1.0%. (Hr'g Tr., June 28, 2012, 28:6–15.) The question here is did VISA impose a 50 BP RIS *requirement* on Vertrue? What is clear from several of Vertrue's witnesses is that they feared that VISA would refuse to continue processing Vertrue's sales drafts after May 15, 2012 if Vertrue did not reduce its RIS below 50 BP. (Hr'g Tr., June 26, 2012, 146:11–21, 165:25–169:20; Hr'g Tr., June 27, 2012, 68:22–69:17.) One can only assume that VISA used very purposeful ambiguity as a way to maintain pressure on Vertrue, leaving open the distinct possibility that VISA would direct Paymentech to cease processing Vertrue's sales drafts after May 15, 2012. VISA has not done so. While Vertrue has been unable so far to reduce its RIS to 50 BP, it has made substantial progress in reducing the RIS below 1.0%. Sometimes discretion is the better part of valor. Since Vertrue's business is likely to be sold soon in any event, VISA may sensibly elect to continue "to consider this situation, and reserve[ ] its rights and remedies." (Ex. 151.)

[15]     Neither the Debtors nor Paymentech sought discovery from VISA. Paymentech had noticed a VISA deposition but never carried through and took it. Paymentech argued that it was VISA's intention to create a requirement, but it failed to offer competent non-hearsay evidence to support the argument. Paymentech must now bear the consequences of failing to call a witness from VISA to address the issue whether Vertrue violated VISA's

### 2.   VISA Determines When a Merchant Should Be Terminated

The VIOR specifically dictates a procedure for evaluating and terminating a merchant such as Vertrue.  In relevant part, the VIOR states that "based on the response from a Member to a Notification of investigation and other available information, Visa will determine whether a violation of the Visa International Operating Regulations has occurred."  (Ex. P4 at 67.)  This provision of the VIOR does not empower Paymentech to make the determination whether VISA's rules and regulations have been violated; Paymentech must take its direction from VISA. In this case, VISA has not determined that Vertrue violated VISA's rules and regulations, and VISA has not directed Paymentech to terminate the Processing Agreements and stop processing Vertrue's sales drafts.  VISA continues to process Vertrue's sales drafts at this time.  Therefore, Paymentech cannot rely on VISA's rules and regulations to show that "cause" exists to warrant lifting the automatic stay.

### 3.   The Balance of Harms Favors Leaving the Processing Agreements in Place

Even if the Court found that cause existed to lift the automatic stay, the balance of hardships strongly favors maintaining the automatic stay.  Termination of the Processing Agreements would significantly impede Vertrue's ability to restructure, if not eliminate the possibility of a successful restructuring entirely, while severely impairing creditor recoveries. Paymentech is also adequately protected from any harm flowing from Vertrue's alleged violation of the Processing Agreements by its $10 million reserve.  Paymentech has not alleged that the $10 million reserve is inadequate to protect it in the event of termination of or a default by Vertrue.  Gerald Lannan, Paymentech's Senior Director of Risk Management, testified that the potential exposure to Paymentech from its relationship with Vertrue is not large enough to

---

rules and regulations.  Paymentech, of course, had the burden of proof establishing cause to lift the automatic stay, a burden it failed to carry.

33

warrant the attention of Paymentech's Credit Committee, and that Paymentech holds a $10

million reserve to mitigate any potential losses it might suffer as a result of its relationship with

Vertrue.  (Lannan Depo., 45:10–46:22.)  Thus, Paymentech's interests are adequately protected.

Finally, Paymentech has provided no evidence supporting its claim that VISA will terminate

Paymentech if it fails to terminate the Processing Agreements.

### III.   CONCLUSION

Based upon the discussion above, the Court concludes that the Debtors are entitled to a

declaration that the Processing Agreements remain property of the estate and a permanent

injunction enjoining Paymentech from taking any action to terminate the Processing Agreements

or otherwise failing to honor its obligations under those agreements based on the reasons set

forth in connection with the Adversary Proceeding until they are assumed or rejected in

accordance with section 365(d) of the Bankruptcy Code.  The Debtors should settle a judgment

resolving the Adversary Proceeding consistent with this Opinion in accordance with Local

Bankruptcy Rule 9074-1.

Additionally, with respect to the Lift-Stay Motion, the Court concludes that Paymentech

has failed to establish "cause" to lift the automatic stay to permit Paymentech to terminate the

Processing Agreements.  Therefore, the Motion to lift the automatic stay is DENIED.  The

Debtors should settle an order consistent with this Opinion in accordance with Local Bankruptcy

Rule 9074-1.

Dated:   July 18, 2012
      New York, New York

                                            **/s/Martin Glenn**
                                               MARTIN GLENN
                         United States Bankruptcy Judge